David **ROBINSON**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, RED ARROW DIVISION, Appellant No. 92–1232,**

David **ROBINSON, Appellant No. 92–1260,**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, RED ARROW DIVISION.**

**Nos. 92–1232 and 92–1260.**

United States Court of Appeals, Third Circuit.

Argued Nov. 3, 1992.

Decided Jan. 8, 1993.

As Amended Jan. 19, 1993.

Saul Krenzel (Argued), Saul H. Krenzel & Associates, Philadelphia, PA, for appellant/cross-appellee, Southeastern Pennsylvania Transp. Authority.

Lorrie McKinley (Argued), Community Legal Services, Inc., Philadelphia, PA, for appellee/cross-appellant, David F. Robinson.

Before: SLOVITER, Chief Judge, STAPLETON and LAY *, Circuit Judges.

LAY, Senior Circuit Judge.

The Southeastern Pennsylvania Transportation Authority (SEPTA) appeals from a $177,477.71 judgment in favor of David Robinson, a former bus cleaner at SEPTA. Robinson claimed that SEPTA dismissed him from his job in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court determined that SEPTA had illegally discriminated against Robinson over the course of two years culminating with his termination on December 24, 1985.

On appeal, SEPTA challenges several of the trial judge's factual determinations, the trial judge's finding that Robinson's opposition to discriminatory practices was sufficient to implicate Title VII's protections, the district court's allocation of the burden of proving failure to mitigate damages, and the award of prejudgment interest. Robinson, on cross-appeal, challenges the trial judge's reduction of his damage award on (1) equitable grounds and (2) to account for federal income tax which he would have paid if he remained employed. We affirm in part, reverse in part, and remand for further proceedings.

### Title VII Violations

SEPTA employed David Robinson, a black male, from February 28, 1983 through December 24, 1985. Robinson worked as a bus cleaner at the Victory Avenue Garage. After about seven months of employment, Robinson began experiencing on-the-job problems which he claims were race related. He attempted to halt the discrimination through several mechanisms. The trial judge determined that SEPTA ultimately dismissed Robinson in retaliation for these efforts, which the court grouped into three clusters of events. The first series of events relates to Robinson's union grievance and Pennsylvania Human Relations Commission (PHRC) complaint in February 1984. The second involves Robinson's letter to his congressman, Rep. Robert Edgar, in mid–1985. The third concerns Robinson's note of complaint to a supervisor in November 1985, shortly before his termination.

■ SEPTA initially asserts that events occurring in early 1984 were too remote from his December 24, 1985 dismissal to be considered a cause of his termination. Although almost two years passed between these events and Robinson's termination from employment, we cannot say the trial judge was clearly erroneous in including these events in his determination that retaliation occurred. The mere passage of time is not legally conclusive proof against retal-

---

* Honorable Donald P. Lay, Senior Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

iation.[1] *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 43 (5th Cir.1992). We find substantial support for the trial judge's conclusion that Robinson's termination had its roots in these earlier confrontations over race.

The trial judge determined that Robinson's troubles began with discussions about race between Robinson and Charles Berridge, the general superintendent of the garage, in September 1983 and February 1984. On September 21, Robinson and another black employee complained to Berridge about a racially offensive remark made by a fellow employee. In mid-February, Robinson again complained to Berridge about racial discrimination, this time concerning a shift change that resulted in Robinson being bumped to the night shift by a less senior black employee. The trial judge found that during this discussion Berridge became verbally abusive. Robinson filed a grievance on February 18, 1984 with his union concerning the incident, and two days later filed a complaint with the Pennsylvania Human Relations Commission (PHRC), alleging his transfer was in retaliation for his September 21, 1983 complaint. On February 24, 1984, Robinson, Berridge and various union officials met to discuss Robinson's union complaint. Robinson testified that his concerns about racism at the garage were a subject of discussion.

Following the union grievance, Robinson's relationship with his supervisors deteriorated sharply. The trial judge determined that Robinson's direct supervisors, all of whom reported to Berridge, began a pattern of harassing Robinson by repeatedly disciplining him for minor matters, miscalculating his points for absences from work, and generally trying to provoke Robinson to insubordination.[2]

The evidence supporting a finding of retaliation for the February, 1984 events is substantial. The issue here, however, is whether there is sufficient evidence to support the trial judge's conclusion that this series of events are causally linked to his termination. The temporal proximity noted in other cases, *see, e.g., Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990), is missing here and we might be hard pressed to uphold the trial judge's finding were it not for the intervening pattern of antagonism that SEPTA demonstrated. As the trial judge found, SEPTA subjected Robinson to a "constant barrage of written and verbal warnings ..., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge." The court could reasonably find that the initial series of events thus caused Robinson's and SEPTA's relationship to deteriorate, and set a pattern of behavior that SEPTA followed in retaliating against Robinson's later efforts at opposing the Title VII violations he perceived. *Cf. Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3d Cir.1990) ("A

---

1. In a retaliatory discharge claim under Title VII, a successful plaintiff must show that (1) he was engaged in a protected activity; (2) he was discharged after or contemporaneously with that activity; and (3) there was a causal link between the protected activity and the discharge. *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990).

2. Although the record contains several examples of Robinson's harassment, these can be illustrated by one incident in early April of 1984. Robinson missed a day of work due to illness. When he returned to work the next day, Robinson brought a note from his doctor explaining that he had been under treatment for stress headaches. At that point, Robinson had a good attendance record. Larry Moore, an acting foreman whose supervisor reported to Berridge, refused to accept the note and accused Robinson of "playing games." The union grieved Robinson's write-up for unexcused absence, but SEPTA denied the grievance at a first level hearing held by Moore. Berridge, however, upheld the grievance on May 1, the same day another SEPTA official informed him in writing of the PHRC complaint.

For the next several months, the disciplinary actions against Robinson stopped. However, the trial judge determined that SEPTA supervised Robinson unusually closely. In October, the pattern of disciplinary actions resumed. Eventually, Robinson was fired more than one year later, in December, 1985.

play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."). Because these events do not stand alone in this case, we cannot say the trial court's finding of a causal link is clearly erroneous.[3]

■ SEPTA also challenges the trial judge's finding that Robinson's letter to his congressman constituted "opposition" within the meaning of Title VII. *See* 42 U.S.C. § 2000e–3(a). The transit authority contends that in the letter, Robinson expressed only personal concerns about his shift assignments. Therefore, SEPTA argues, the letter is not in opposition to any practice that could violate Title VII and as such is not protected. *See Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991). Since this question, too, requires a factual determination, we review it on a clearly erroneous standard. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This is true even when the finding turns on documentary evidence, *id.* at 574, 105 S.Ct. at 1511–12 as is the case here.[4]

The trial judge determined that the letter to Congressman Robert Edgar implicated Title VII's protections. Although Robinson's attorneys admit the letter is not artfully drawn, we have little trouble agreeing that it sufficiently articulated Robinson's opposition to racial discrimination at the Victory Avenue Garage.[5]

■ SEPTA also challenges the trial judge's conclusion that it retaliated against Robinson for his letter to Rep. Edgar. We cannot say, however, that the trial judge was clearly erroneous in this finding. There is substantial evidence supporting the trial judge's finding of retaliation, much of it temporal in nature, *see Jalil*, 873 F.2d at 708. Rep. Edgar wrote the transit authority in June 1985, asking it to look into Robinson's concerns. Soon thereafter began another round of disciplinary actions which the trial judge determined were pretextual. SEPTA officials admitted that in one of the incidents its staff "jumped the gun" in holding Robinson off from work for refusing to visit the transit authority's medical department. At roughly the same time, one of Robinson's supervisors wrote that Robinson had not "exhibited any violent behavior in the recent past" even though Robinson had *never* exhibited violent behavior at work. This letter was

3. The transit authority also asserts that the trial judge erred in determining Robinson's complaint to the PHRC caused much of the aforementioned disciplinary activity. It states that there was no evidence at trial that SEPTA supervisors were aware Robinson had filed a complaint until after they had issued the discipline in question. SEPTA has misread the trial judge's findings. Although he included the PHRC complaint in his first cluster of events, the trial judge traced the earliest disciplinary actions to Robinson's union grievance. Indeed, the trial judge noted that disciplinary attacks on Robinson abated temporarily after his supervisors became aware of the PHRC complaint. Thus, the trial judge did not ascribe any unwarranted effect to the PHRC complaint.

4. Some courts have distinguished between the activities protected by the two clauses of 42 U.S.C. § 2000e–3(a) that prohibit employer retaliation. The "opposition clause" prohibits retaliation because the employee "opposed any practice made an unlawful employment practice by [Title VII.]" The "participation clause" prohibits retaliation because the employee "made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under [Title VII.]" *See Holden v. Owens–Illinois, Inc.*, 793 F.2d 745, 748–53 (6th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986). These courts have noted that the "means of opposition have been narrowly construed" to limit Title VII protection in circumstances when the employee's protests interfere with job performance. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312–13 (6th Cir.1989). This limitation is unimportant here because SEPTA does not claim that Robinson's efforts at "opposition" were themselves grounds for dismissal.

5. The letter states that one of Robinson's supervisors "seems bent on harassing nothing but black employees. This man is responsible for other minority employees being terminated, quitting, or transferred from this shop. I don't want any of the above to happen to me." Robinson asked for Rep. Edgar's assistance and stated that he was considering legal action over the problem.

included in Robinson's permanent record. In August and September Robinson and SEPTA had several disputes over Robinson's absences in which SEPTA exaggerated his conduct. For example, SEPTA gave Robinson twenty points for missing two days of work. Later it reduced the penalty to six points even though it determined his absence was excused. These facts sufficiently support the trial judge's finding of retaliation.

■ SEPTA additionally challenges the trial judge's finding that a letter Robinson wrote to one of his supervisors, Rick Davis, constituted opposition. In the letter Robinson complained of management's "blatant racism" and stated the matter could "end up in court very soon." SEPTA challenges the letter as being too vague to give rise to a claim of opposition under Title VII. The district court, however, found that SEPTA immediately retaliated against Robinson by suspending him the following day for an unexcused absence. Even though Robinson presented SEPTA with a note explaining his absence, SEPTA refused to withdraw the discipline. Robinson won a grievance over the incident. SEPTA discharged Robinson one month later. Given that context, we cannot say the letter was too vague to suggest Robinson's opposition.

SEPTA also argues that Robinson did not meet his burden of proving pretext because the trial judge found that he was, indeed, insubordinate. SEPTA reads the trial judge's opinion too narrowly. The opinion states: "Robinson did not walk off the job or otherwise engage in insubordinate behavior on November 29, 1985. He went home because he was unable to perform his regular duties in full due to illness." This finding indicates that the trial judge's later discussion of the implications of what would occur "if plaintiff was technically insubordinate" did not constitute a determination that Robinson was insubordinate. We thus need not determine the legal significance of finding Robinson to be insubordinate.

### Mitigation of Damages

SEPTA next challenges the trial court's determination that Robinson met his statutory duty to mitigate damages. The trial court based its finding on the lack of any evidence from SEPTA that Robinson failed to mitigate. SEPTA argues that in so deciding, the trial court wrongly allocated it the burden of proving that Robinson failed to mitigate his damages.

■ SEPTA confuses the burden of proving failure to mitigate with the duty to mitigate. While the latter falls on the discharged employee, the former falls on the employer. One of the cases SEPTA relies on, *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir.), *cert. denied*, 498 U.S. 987, 111 S.Ct. 525, 112 L.Ed.2d 536 (1990), spells out this distinction succinctly. It states: "Although the statutory duty to minimize damages is placed on the Title VII plaintiff, the employer has the burden of proving failure to mitigate." *Id.; see also Anastasio v. Schering Corp.*, 838 F.2d 701, 707–08 (3d Cir.1988) (characterizing failure to mitigate as an affirmative defense for which the defendant carries the burden of proof). We agree.

■ In this case, Robinson submitted a list of the jobs he held after being discharged by SEPTA. SEPTA had ample opportunity to meet its burden to show that this constituted inadequate effort by Robinson to fulfill his statutory duty to mitigate. SEPTA failed to cross-examine him as to the nature of his search elsewhere. Thus, while the record of Robinson's efforts to mitigate stands in sharp contrast to that provided by plaintiffs in some other cases, *see, e.g., Anastasio*, 838 F.2d at 708, once the record is viewed in light of SEPTA's burden to prove Robinson's failure to mitigate, we cannot disturb the findings of the trier of fact regarding damages.

### Prejudgment Interest

■ The transit authority also questions the trial judge's award of prejudgment interest. The determination of whether to award prejudgment interest in a Title VII case is committed to the discretion of the district court. *Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir.1979).

■ Here, the trial court relied on a stipulation between the parties to determine that SEPTA should pay Robinson prejudgment interest. A close reading of the stipulation, however, shows that SEPTA agreed only to the computations, and did not agree that it should pay prejudgment interest. The stipulation states that neither party waived the right to challenge the "appropriateness of the remedy." [6] We hold that the trial court erred in determining that SEPTA stipulated to pay prejudgment interest and we remand the question whether prejudgment interest should be allowed under the facts of the case.

*Cross–Appeal*

*Income Tax*

■ The first of Robinson's contentions on cross-appeal challenges the district court's reduction of his backpay award to account for federal taxes Robinson would have paid had he continued working at SEPTA.

Although Title VII's backpay awards are of an equitable nature, the Supreme Court has restricted the trial judge's discretion to deny such an award. In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975), the Court stated that "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."

The trial court relied on this court's decision in *Rickel v. Commissioner*, 900 F.2d 655, 663–64 (3d Cir.1990), to hold that Robinson would not have to pay federal income taxes on the award. Following the trial judge's opinion, however, the Supreme

Court decided *United States v. Burke*, —— U.S. ——, ——, 112 S.Ct. 1867, 1874, 119 L.Ed.2d 34 (1992), holding that backpay awards under Title VII are taxable. Because backpay awards are taxable in the year paid, *Tanaka v. Department of Navy*, 788 F.2d 1552, 1553 (Fed.Cir.1986); *Blim v. Western Elec. Co.*, 731 F.2d 1473, 1479 (10th Cir.), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984); Rev.Rul. 78–336, 1978–2 C.B. 255, the effect of the trial judge's ruling is to tax Robinson twice—first by reducing the award for taxes he would have not had to pay under *Rickel* and then by requiring him to pay taxes under *Burke*. Under the circumstances, we remand to the district court with directions to reinstate the amount of the award reduced for payment of income taxes.

*Equitable Reduction*

■ The trial court also supported its reduction of Robinson's award of backpay by finding that Robinson contributed to the decay of his working relationship with SEPTA. Neither the trial judge nor SEPTA has provided any case law in which backpay damages were reduced through a comparative fault-type analysis. It is questionable whether the trial court believed, irrespective of the tax consequences, that the backpay award should be reduced to account for Robinson's blame. However, we need not remand this question inasmuch as we believe that such a reduction is impermissible. It was well established at the time of the district court's decision that Title VII did not allow awards for compensatory damages.[7] Instead, it provided for backpay and other remedies. *See, e.g.*, 42 U.S.C. § 2000e–5(g); *Burke*, —— U.S. at ——, 112 S.Ct. at 1873. In *Burke*, the Court characterized the backpay award as

---

6. The stipulation similarly lists the amounts Robinson would have paid in federal taxes had he remained employed. Neither party suggests that they agreed to stipulate to reduce Robinson's backpay award to account for these amounts; indeed, the reduction in backpay remains a matter of dispute between the parties. The stipulation's similar treatment of prejudgment interest and the reduction for federal taxes reinforces our conclusion that SEPTA did not stipulate to paying prejudgment interest.

7. Title VII was amended in November of 1991 to authorize the recovery of compensatory and punitive damages. Pub.L. No. 102–166, § 102, 105 Stat. 1072 (1991) (codified at 42 U.S.C.A. § 1981a (West Supp.1992). Robinson does not contend that this amendment is applicable to this case.

representing "an amount *equal* to the wages the employee would have earned from the date of discharge to the date of reinstatement, along with lost fringe benefits such as vacation pay and pension benefits." *Id.* (emphasis added). It stated:

> The Court previously has observed that Title VII focuses on "legal injuries of an economic character," consisting specifically of the unlawful deprivation of full wages earned or due for services performed, or the unlawful deprivation of the opportunity to earn wages through wrongful termination. The remedy, correspondingly, consists of restoring victims, through backpay awards and injunctive relief, to the wage and employment positions they would have occupied absent the unlawful discrimination.

*Id.* (citations omitted). In *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 719, 98 S.Ct. 1370, 1381, 55 L.Ed.2d 657 (1978), the Court stated that the *"Albemarle* presumption in favor of retroactive liability can seldom be overcome."

Title VII contemplates that a corporation may be liable for dismissing an employee when its motives contain a mixture of legitimate and illegitimate reasons. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 237–38, 109 S.Ct. 1775, 1783–84, 104 L.Ed.2d 268 (1989).[8] Allowing trial courts to reduce a backpay award to account for the legitimate considerations would be extremely speculative and would frustrate the "make whole" purpose of Title VII. *See Albemarle*, 422 U.S. at 421, 95 S.Ct. at 2373.[9]

## Reinstatement

■ Finally, Robinson argues the trial judge abused his discretion in declining to reinstate Robinson to a position with SEPTA. Title VII provides that the court may order "reinstatement ... with or without back pay ..., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g). Although reinstatement is the preferred remedy to avoid future lost earnings, a court may deny reinstatement "when, for example, animosity between the parties makes such a remedy impracticable." *Ellis v. Ringgold Sch. Dist.*, 832 F.2d 27, 30 (3d Cir.1987), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 796 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986).

■ The trial judge concluded that the "demonstrated irreparable conflict" between Robinson and SEPTA supervisors made reinstatement impracticable. He cited SEPTA's complaints about Robinson and Robinson's own testimony referring to SEPTA managers as South African dogs. Given hostilities such as those, the trial judge was well within his discretion in refusing to reinstate Robinson.[10]

## Conclusion

For the above reasons, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

**8.** In the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1076, enacted after this case was tried, Congress strengthened this point by overruling that portion of *Price Waterhouse* that permitted an employer to avoid liability if it could demonstrate it would have taken the same action in the absence of discriminatory motive. The Act states: "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* (codified at 42 U.S.C. § 2000e–2(m)).

**9.** In *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 79 (3d Cir.1986), this court permitted equitable consideration of a plaintiff's delay in bringing a Title VII suit. In this case, however, the trial judge did not find SEPTA was prejudiced by Robinson's conduct in prosecuting his case. Instead it relied on his on-the-job conduct.

At least one district court has similarly cited equitable considerations in reducing a backpay award. In *Brown v. Guthrie*, 22 Fair Empl. Prac.Cas. (BNA) 1627 (W.D.Okla. May 30, 1980), a constructive discharge case, the district court reduce the plaintiff's backpay award by 40 percent to account for secondary reasons why she resigned from her job. Of course, the *Brown* opinion is not binding on us and in any event, its reasoning is inapplicable to Robinson since he desired to remain employed by SEPTA.

**10.** Robinson has waived any claim to front pay; thus we need not address this issue.

On remand the district court should determine under the facts of the case whether prejudgment interest should be granted and should reinstate plaintiff's award it had reduced for income tax and equitable reasons.