In the

# United States Court of Appeals
### For the Seventh Circuit

———————

Nos. 04-3680, 05-1998, 05-3770

JANE DOE,

*Plaintiff-Appellant*,

and

JANE ROE and JANE ROE 2,

*Proposed-Intervenors-Appellants*,

*v.*

OBERWEIS DAIRY,

*Defendant-Appellee*.

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 4774—**John W. Darrah**, *Judge*.

———————

ARGUED MAY 30, 2006—DECIDED JULY 28, 2006

———————

Before POSNER, KANNE, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff, who is being permitted to litigate her case under a pseudonym, was a high-school student hired as a part-time ice cream "scooper" at the defendant's store in Bartlett, Illinois. She sued under Title VII of the Civil Rights Act of 1964, with supplemental

claims for battery, intentional infliction of emotional
distress, and related common law wrongs, claiming that
a shift supervisor at the store, Matt Nayman, had harassed
her sexually, culminating in sexual intercourse, for which he
was prosecuted, convicted, and imprisoned. For Doe was
only 16 years old when they had sex, and the age of consent
in Illinois is generally 17, 720 ILCS 5/12-16(d), rising to 18
if the accused holds "a position of trust, authority, or
supervision in relation to the victim." 720 ILCS 5/12-16(f).
We need not decide whether the Illinois courts would think
Nayman held such a position in relation to the plaintiff.

The district judge rejected the Title VII claim on the basis
of the defendant's motion for summary judgment. He
reasoned that the plaintiff had failed to exhaust her admin-
istrative remedies and that in any event her claim had no
merit because her relationship with Nayman, including
their one incident of sexual intercourse, had been voluntary
and had occurred outside the workplace and because
Nayman's conduct within it had not been, the judge
thought, sufficiently offensive to amount to sexual harass-
ment. Having dismissed the plaintiff's federal claim before
trial, the district judge then, as is routine, relinquished
jurisdiction of the supplemental claims to the state courts.

The plaintiff's main appeal challenges the judgment; in a
separate appeal she challenges the district court's award of
costs to the defendant. The appeal by the plaintiff's mother
and younger sister, the Roe appellants, is from the district
judge's denial of their motion to intervene in the litigation.
They sought intervention to contest the judge's grant of the
defendant's motion for access to the records of the plaintiff's
psychiatric therapy sessions, at some of which the mother
and the sister were present. The plaintiff also objects. The
records were not turned over; instead, when the plaintiff's

objection was rejected, she trimmed her evidence of emotional distress.

The Administrative Procedure Act requires plaintiffs to exhaust their administrative remedies before seeking judicial review of agency action. 5 U.S.C. § 704; *Darby v. Cisneros*, 509 U.S. 137, 143-47 (1993); *Glisson v. U.S. Forest Service*, 55 F.3d 1325, 1326 (7th Cir. 1995). Doe's suit does not seek judicial review of the EEOC's handling of her discrimination charge, or of any other agency action, and so the APA is inapplicable. *Riley v. American Family Mutual Ins. Co.*, 881 F.2d 368, 373 (7th Cir. 1989); *Flowers v. Laborers Int'l Union*, 431 F.2d 205, 208 (7th Cir. 1970); see also *Roach v. Morse*, 440 F.3d 53, 58 (2d Cir. 2006); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 824-25 (9th Cir. 2002); *Cleghorn v. Herrington*, 813 F.2d 992, 994-95 (9th Cir. 1987). Title VII has its own requirements as to what claimants must do before they can sue, but at least so far as the statutory text is concerned, those requirements are limited to (1) filing a charge with the Equal Employment Opportunity Commission within 180 days after the date of the complained-of employment action, in states that do not have an equal employment opportunity agency, and within 300 days in states like Illinois that do, in which event the complainant must file his complaint with that agency at least 60 days before filing with the EEOC, and (2) waiting to sue until receiving notification (the "right to sue" letter) from the Commission that the Commission does not intend to sue. The Commission must issue the letter within 180 days after receiving the charge. 42 U.S.C. §§ 2000e-5(c), (e), (f)(1); *Martinez v. United Automobile, Aerospace & Agricultural Implement Workers*, 772 F.2d 348, 350 (7th Cir. 1985).

The purpose of these requirements is both to give the Commission a chance to investigate the charge and decide whether to sue, and to encourage the complainant and the

employer, with or without the state agency's or EEOC's assistance, to resolve their dispute informally. *Horton v. Jackson County Board of County Commissioners*, 343 F.3d 897, 899-900 (7th Cir. 2003); *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005); *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1195 (10th Cir. 2004). Many disputes are resolved at this stage, reducing the burden on the courts of enforcing Title VII; last year the Commission received 55,976 Title VII charges, of which 10,286, or almost 20 percent, were resolved without any litigation (computed from the Commission's website, http://www.eeoc.gov/stats/vii. html, visited June 7, 2006). In addition, the charge filed with the Commission limits the claims that the complainant may raise in litigation.

If the dispute is not settled at the administrative stage, the complaining party has a right to sue (unless the Commission decides to sue, *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 469-70 (1982); *Chandler v. Roudebush*, 425 U.S. 840, 844-45 (1976); *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 456 (6th Cir. 1999)) even if the Commission has investigated and decided that the claim is groundless. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44-45 (1974); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798-99 (1973); *Solimino v. Astoria Federal Savings & Loan Ass'n*, 901 F.2d 1148, 1151-52 (2d Cir. 1990). The Commission's exercise of the administrative equivalent of prosecutorial discretion does not bar a private suit.

To facilitate its investigation during the 180-day period, the Commission requires the complainant to cooperate, including by participating in a factfinding conference with Commission staff. 29 C.F.R § 1601.15(c). If the complainant fails to cooperate and the failure prevents the Commission from resolving the charge, the Commission can

dismiss it. § 1601.18(b). Although neither the regulations nor Title VII makes cooperation a condition of the complainant's being able to sue, the Tenth Circuit has decided that failure to cooperate in good faith is a bar to suit. *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304 (10th Cir. 2005). (*Shikles* was a suit under the Age Discrimination in Employment Act, but most of the court's discussion is of Title VII.) The Commission has expressed its disagreement with the Tenth Circuit's position in a series of amicus curiae briefs, one filed with us in this case. Because Jane Doe declined to be interviewed by Commission staff, the Commission dismissed her administrative complaint for failure to cooperate. But it still issued her a "right to sue" letter, and the defendant does not dispute that the Commission was required to do so.

*Shikles* is inconsistent with our decision in *Zugay v. Progressive Care, S.C.*, 180 F.3d 901, 903 (7th Cir. 1999). Remember that in states that have an equal employment opportunity agency, the Title VII complainant must file a charge with that agency and cannot proceed further for 60 days. Zugay duly filed, and the agency scheduled a factfinding conference. But before the conference was held, the 60 days expired and Zugay jumped to the next stage (filing with the EEOC). The defendant argued that Zugay had failed to exhaust her administrative remedies. We disagreed. The only statutory requirement was that the claimant file with the state agency and wait 60 days. The fact that had she been more patient the case might have been resolved on the basis of the factfinding conference that the agency had scheduled did not prevent her from abandoning the process on pain of not being allowed to sue. She did not cooperate, yet could sue anyway.

In *Shikles*, it is true, as in this case, the complainant stopped cooperating during rather than after the stat-

utory period. But the point of *Zugay*, which is equally apposite to this case and *Shikles*, is that the statute does not impose a duty of cooperation, whether during or after the statutory period. The opinion in *Zugay* points out that the complainant had in fact cooperated with the agency for more than 60 days, 180 F.3d at 903, but adds not only that all she was required to do was to "allow . . . the agency 60 days to act," but also that the state could if it wanted waive the 60-day requirement. *Id*. In other words, it could say forget about cooperation. That in effect is what the EEOC has done, and not just in its amicus curiae briefs. *Walker v. United Parcel Service, Inc.*, 240 F.3d 1268, 1274-77 (10th Cir. 2001) upheld an EEOC regulation that authorizes the Commission to allow the complainant to sue *before* the end of the 180-day period that the statute gives the Commission to decide whether to sue on its own. If suit can thus be brought before the administrative exhaustion period has expired, that period can hardly be jurisdictional, as the Tenth Circuit in *Shikles* thought.

We acknowledge that without a court-fashioned bar to suits by noncooperators, complainants under Title VII, as well as complainants under similar employment-discrimination statutes, such as the Age Discrimination in Employment Act and the Americans with Disabilities Act, *Shikles v. Sprint/United Mgmt. Co., supra*; *McBridge v. CITGO Petroleum Corp.*, 281 F.3d 1099 (10th Cir. 2002), will have less incentive to cooperate with the Commission, and as a result fewer disputes will be resolved at the administrative stage. But if the problem were a significant one, we would expect some evidence of this to have surfaced in the 42 years since Title VII was promulgated, and none has; we would also expect the EEOC to have supported rather than opposed the Tenth Circuit's position.

There is, as we said, no basis in the language of Title VII for that position. The Tenth Circuit acknowledged the Supreme Court's "admonition that no requirements beyond those in the statute should be imposed," *Shikles v. Sprint/United Mgmt. Co., supra*, 426 F.3d at 1315; see *Mohasco Corp. v. Silver*, 447 U.S. 807, 816 n. 19 (1980); *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 798-99; *Eichman v. Linden & Sons, Inc.*, 752 F.2d 1246, 1249 (7th Cir. 1985)—but it imposed them anyway. So the Tenth Circuit's gloss on Title VII is confessedly adventurous, and this will distress originalists. It is also in severe tension with the Supreme Court's recent observation, concerning the "exhaustion" provisions in both Title VII and the Age Discrimination in Employment Act, that "neither of these provisions makes reference to the concept of exhaustion, and neither is in any sense an exhaustion provision." *Woodford v. Ngo*, No. 05-416, 2006 WL 1698937, at *9 (S. Ct. June 22, 2006). Title VII imposes procedural requirements as a precondition to bringing a suit in federal court that is an original proceeding rather than one to review agency action. Doe satisfied all those requirements. Title VII does not incorporate anything like the full apparatus of exhaustion, an apparatus designed as we have noted for cases in which judicial review of an adjudication or a rule is sought. We shall continue for convenience to refer to Title VII's "exhaustion" requirements, but they must not be confused with the requirements for APA-type exhaustion.

The decisive objection to the Tenth Circuit's position is that if widely adopted it would protract and complicate Title VII litigation, and with little or no offsetting benefit if we are right in thinking that the problem of complainants who by failing to cooperate with the Commission thwart the conciliation process and as a result thrust additional cases on the federal courts is a slight one. In *Shikles* the complain-

ant's lack of cooperation could be established with unusual ease: he refused to be interviewed, failed to provide the EEOC with the documents that it requested, failed to explain why he could not provide them, and his lawyer failed to respond to several of the EEOC's efforts to reach him. In the next case, however, the complainant might sit for the interview but refuse to answer questions. In the case after that he would answer questions but do so cryptically. And in a subsequent case he would answer questions fully but fail to bargain in good faith over the employer's offer of a settlement.

For the "cooperation" theory of exhaustion requires not merely pro forma compliance with the Commission's regulations but, as *Shikles* put it, a "good faith effort at cooperation." 426 F.3d at 1317. We know from cases under the National Labor Relations Act, which requires unions and employers to bargain in good faith, 29 U.S.C. § 158(d); *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 198-99 (1991), how difficult it is to enforce such a duty, *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1447 (D.C. Cir. 1997) (concurring opinion), because it jostles uneasily with the right (see 29 U.S.C. § 158(d); *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 106-08 (1970)) of each party to a labor negotiation to refuse an offer by the other even if a neutral observer would think it a fair, even a generous, offer. *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1187 (5th Cir. 1982); *Eastern Maine Medical Center v. NLRB*, 658 F.2d 1, 10 (1st Cir. 1981); *NLRB v. Milgo Industrial, Inc.*, 567 F.2d 540, 542-43 (2d Cir. 1977) (Friendly, J.); see also *PSI Energy, Inc. v. Exxon Coal USA, Inc.*, 17 F.3d 969, 974 (7th Cir. 1994). To allow employers to inject such an issue by way of defense in every Title VII case would cast a pall over litigation under that statute.

The fact that in *Shikles* the refusal to cooperate was palpable may have concealed the lurking difficulties in the

rule that it adopted. In our case, the veil is pulled back slightly. The plaintiff was only 17 when the charge was filed with the EEOC, and because of her youth it was filed not by her but by her lawyer. The lawyer supplied the Commission's staff with information that enabled the staff to interview ten witnesses to the alleged harassment. When the Commission requested an interview with the plaintiff herself, however, her lawyer turned down the request on the ground that both he and the plaintiff's psychotherapist believed the interview would upset the plaintiff. The lawyer offered to furnish the Commission with answers to any questions that the staff would have wanted to ask the plaintiff in an interview.

Was this a failure by the plaintiff to "cooperate"? In a literal sense, yes, as the Commission ruled in dismissing the administrative complaint on that basis. Evidently the Commission didn't think that without interviewing the plaintiff it could determine whether to bring suit against the employer on her behalf. It brings very few cases and so wants to be very sure of the merits before proceeding. But was she acting in bad faith in failing to cooperate to the extent sought by the Commission? For all we know, even the Tenth Circuit would say no; for she had a reason not to cooperate. Nor is there any indication that by failing to sit for an interview she made it more difficult to resolve her dispute with the defendant before bringing suit. The defendant would not have had access to a transcript of the interview unless and until she sued.

Failure to exhaust administrative remedies can often be excused. E.g., *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000); *McCarthy v. Madigan*, 503 U.S. 140, 146-49 (1992); *Ruttenberg v. United States Life Ins. Co.*, 413 F.3d 652, 662 (7th Cir. 2005); *Woodall v. Federal Bureau of*

*Prisons*, 432 F.3d 235, 239 n. 2 (3d Cir. 2005); *United States v. Calderon*, 391 F.3d 370, 375 (2d Cir. 2004). And especially when creating an exhaustion requirement, a court can build in exceptions. *Watts v. BellSouth Telcommunications, Inc.*, 316 F.3d 1203, 1206-07 (11th Cir. 2003). "To the extent that [exhaustion of administrative remedies] is a doctrine of federal common law rather than the inflexible command of a statute, it is to be applied with due regard for its underlying purpose and for considerations that may in particular cases counsel for a waiver." *Glisson v. United States Forest Service*, *supra*, 55 F.3d at 1327; see also *Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 445-46 (2d Cir. 2006). "Only when Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision . . . has the Supreme Court held that exhaustion is a jurisdictional prerequisite." *I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Industries*, 727 F.2d 1204, 1208 (D.C. Cir. 1984).

We are quite aware that exhaustion of administrative remedies is required when the Title VII plaintiff is a federal employee. E.g., *Hill v. Potter*, 352 F.3d 1142, 1145-46 (7th Cir. 2003); *Greenlaw v. Garrett*, 59 F.3d 994, 996-98 (9th Cir. 1995); *Khader v. Aspin*, 1 F.3d 968, 971 (10th Cir. 1993). But the statutory framework is different. In private-sector cases the EEOC must bring a lawsuit if it wants to obtain relief for a victim of discrimination. But in federal-employee cases it can provide that relief through its own administrative process. 42 U.S.C. § 2000e-16(b). That is a situation in which exhaustion is invariably required, e.g., *Reiter v. Cooper*, 507 U.S. 258, 269 (1993); *McCarthy v. Madigan*, 503 U.S. 140, 144-48 (1992); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 551 (10th Cir. 2001)—indeed by the Administrative Procedure Act, as we saw earlier. For otherwise the claimant would have an arbitrary choice of forums, and the courts

would be burdened with litigation that could have been conducted, perhaps more expeditiously and expertly, before the administrative body. That is not a course open to the private-sector Title VII claimant, because the EEOC cannot enforce the statute administratively on behalf of such a claimant, cf. *Sayaxing v. INS*, 179 F.3d 515, 522-23 (7th Cir. 1999), but only by filing a suit.

In addition, federal employees must file their discrimination complaints directly with the agency that employs them, rather than with the EEOC, 42 U.S.C. § 2000e-16(c); *Brown v. GSA*, 425 U.S. 820, 828-35 (1976), so that judicial interference with the operation of the federal government will be minimized. *Jasch v. Potter*, 302 F.3d 1092, 1096 (9th Cir. 2002); *McRae v. Librarian of Congress*, 843 F.2d 1494, 1496 (D.C. Cir. 1988) (per curiam); cf. *Robinson v. Dalton*, 107 F.3d 1018, 1020-21 (3d Cir. 1997). That aim would be blunted if the employee could bypass the employer by not cooperating with him.

We conclude at long last that Jane Doe "exhausted" her administrative remedies, and so we come to the merits of her appeal. Construing the evidence as favorably to her as the record permits, as we must, we assume that Nayman, the shift supervisor, regularly hit on the girls (most of the employees were teenage girls) and young women employed in the ice cream parlor. He would, as one witness explained, "grope," "kiss," "grab butts," "hug," and give "tittie twisters" to these employees, including the plaintiff. These things he did in the store, but he would also invite the girls to his apartment. He had sexual intercourse in the apartment with two of them, one of them a minor, before it was the plaintiff's turn. He was 25 when he had intercourse with her.

The district judge ruled that the plaintiff was not harassed, because she welcomed Nayman's advances. See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). In so ruling, however, the judge stepped out of the proper role of a judge asked to decide a motion for summary judgment and made findings on contested factual issues relating to her dealings with Nayman, as when the judge said that "once, Nayman gave Plaintiff a hug and kiss in an effort to make Plaintiff happy," or that "Nayman also 'playfully' hit Plaintiff on the behind with a rag on one occasion."

What is uncontested is that Nayman did not commit forcible rape. But he committed statutory rape, that is, intercourse with an underage person, which is made a crime because of a belief that below a certain age a person cannot (more realistically, is unlikely to be able to) make a responsible decision about whether to have sex. *Valencia v. Gonzales*, 439 F.3d 1046, 1053 (9th Cir. 2006); Michelle Oberman, "Regulating Consensual Sex with Minors: Defining a Role for Statutory Rape," 48 *Buff. L. Rev.* 703, 710 (2000). In Illinois as elsewhere the crime is considered more serious the greater the disparity in ages between the parties. The theory is that a young girl (or boy) is likely to have particular difficulty resisting the blandishments of a much older man. 720 ILCS 5/12-15(c), 16(d). Nayman was nine years older than Jane Doe when they had sex.

"The age of consent fixed by a state represents a legislative judgment about the maturity of girls in matters of sex." *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 450 (7th Cir. 2000). To avoid undermining valid state policy by reclassifying sex that the state deems nonconsensual as consensual, to simplify employment-discrimination litigation, and to avoid intractable inquiries into maturity that legislatures invariably pretermit by basing entitlements to public

benefits (right to vote, right to drive, right to drink, right to own a gun, etc.) on specified ages rather than on a standard of "maturity," federal courts, rather than deciding whether a particular Title VII minor plaintiff was capable of "welcoming" the sexual advances of an older man, should defer to the judgment of average maturity in sexual matters that is reflected in the age of consent in the state in which the plaintiff is employed. That age of consent should thus be the rule of decision in Title VII cases. This conclusion is consistent with cases in related contexts, *Mary M. v. North Lawrence Community School Corp.*, 131 F.3d 1220, 1226 (7th Cir. 1997); *Doe by Doe v. Greenville Hospital System*, 448 S.E.2d 564, 566 (S.C. App. 1994); with the provision of the *Restatement of Torts* that "if conduct is made criminal in order to protect a certain class of persons irrespective of their consent, the consent of members of that class to the conduct is not effective to bar a tort action," *Restatement (Second) of Torts* § 892C (1979); and with the common practice of using state law to fill gaps in federal law. E.g., *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 108-09 (1991); *United States v. Kimbell Foods, Inc*, 440 U.S. 715, 727-28 (1979).

We realize that as a consequence of our approach the protection that Title VII gives teenage employees will not be uniform throughout the country, since the age of consent is different in different states, though within a fairly narrow band. Uniformity would require federal courts either to specify an age at which American teenagers shall be deemed capable of consenting to sexual advances in the workplace or to determine the individual plaintiff's maturity in each case. Neither of these alternatives is satisfactory; both in their different ways are arbitrary. Deferring to each state's determination of the age of consent not only makes the litigation of cases such as this much simpler and no more arbitrary; it also reflects the differences among the states in

judgments about the maturity of teenagers in sexual matters.

For completeness we add that although consent to sexual relations with a coworker or supervisor is not a defense in a Title VII suit for sexual harassment brought by a plaintiff who was underage when the conduct alleged to constitute harassment occurred, this does not mean that the conduct of the plaintiff can never be used to reduce the defendant's damages in such a case. In a negligence case brought by an exchange student against the company that had placed her with a couple and the husband raped her, we said that "it would have been error to instruct the jury that because Kristin was below the age of consent her comparative fault must be reckoned at zero. That would have given too much force to the criminal statute in this civil case, for the statute cannot be considered a legislative judgment that minors are utterly incapable of avoiding becoming ensnared in sexual relationships." *Beul v. ASSE Int'l, Inc.*, *supra*, 233 F.3d at 450-51; see also *LK v. Reed*, 631 So. 2d 604, 607-08 (La. App. 1994); *Morris v. Yogi Bear's Jellystone Park Camp Resort*, 539 So. 2d 70, 76-78 (La. App. 1989); *Robinson v. Roberts*, 423 S.E.2d 17, 18 (Ga. App. 1992); contra, *Hutchison v. Luddy*, 763 A.2d 826, 848-49 (Pa. Super. 2000), vacated on other grounds, 870 A.2d 766 (Pa. 2005). *Beul* was a common law negligence case, however; this is a Title VII case and we cannot find a case under Title VII in which comparative fault was recognized as a complete or partial defense to liability.

Title VII does require mitigation of damages with respect to back pay, because it provides that "interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C.

§ 2000e-5(g)(1); see *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32 (1982); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1580-81 (7th Cir. 1997). But failure to mitigate is distinct from comparative fault. The duty to mitigate arises after the plaintiff has been injured, the duty of care before. *Robinson v. Southeastern Pennsylvania Transportation Authority*, 982 F.2d 892, 898-99 (3d Cir. 1993), rejected a defense of comparative fault in the context of back pay—understandably, as comparative fault is a common law defense and back pay is an equitable remedy, even after the amendment to Title VII that added a damages remedy to the statute. *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 500 (7th Cir. 2000); *Lutz v. Glendale Union High School, District No. 205*, 403 F.3d 1061, 1067-69 (9th Cir. 2005).

In adding that remedy Congress did not indicate whether or what defenses based on victim fault might be available to a defendant; and there is no pertinent legislative history. Congress may have felt that to recognize such a defense in a discrimination case would be "blaming the victim" with a vengeance, for it would amount to saying that a person might be to blame for being discriminated against on the basis of his race or sex or some other forbidden criterion. Of course such a victim may have contributed to the adverse employment action of which he complains; he may have been an incompetent employee whom his employer would have fired wholly apart from the employee's membership in a protected group, and if so he could not get damages. But it would be odd and even disasteful to blame him for the invidious discrimination itself.

This case, however, is unusual because the plaintiff was an active participant in, rather than a passive victim of, the principal discriminatory act of which she complains—the act of sexual intercourse with Nayman. At the damages

stage of this proceeding, should it get that far, the defendant—who is not Nayman, but Nayman's employer—should be permitted to put Nayman's conduct in perspective. If Doe was sneaking around behind her mother's— and her employer's—back and thus facilitating Nayman's behavior, the employer may be able to show that the harm she suffered that was caused by its violation of Title VII (if such a violation is found on remand), rather than by Nayman, was minimal.

That would be a straightforward application of the principle that a plaintiff may recover from a defendant only those compensatory damages that can fairly be traced to the defendant's conduct. "The normal measure of tort damages is the amount which compensates the plaintiff for all of the damages proximately caused by the defendant's negligence," *Hayman v. Wilkerson,* 535 A.2d 880, 885 (D.C. 1987); see also *Restatement (Second) of Torts* § 917, comment c (1979) ("the rules that determine the causal relation necessary to liability are as fully applicable to establish the extent of liability as to establish its existence")—that is, caused by the defendant's failure to exercise the degree of care that the law requires. What that degree of care is in a case such as the present one is taken up later in this opinion. Though inquiries into the maturity of individual minors are, as we said earlier, bound to be fraught with uncertainty, a jury should be able to sort out the difference between an employer's causal contribution to the statutory rape by its employee of a 16-year-old siren (if that turns out to be an accurate description of Doe) and to similar conduct toward, say, a 12-year-old.

But in discussing an issue for the damages phase of a remanded proceeding we have gotten ahead of ourselves, as we have not yet resolved a crucial issue of liability. That

Doe cannot be taken to have consented to Nayman's advances does not establish *workplace* sexual harassment. Title VII is limited to employment discrimination, and therefore sexual harassment is actionable under the statute only when it affects the plaintiff's conditions of employment. *Burlington Northern & Santa Fe Ry. v. White*, No. 05-259, 2006 U.S. LEXIS 4895, at *15-17 (U.S. June 22, 2006); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986); *McPherson v. City of Waukegan*, 379 F.3d 430, 437-38 (7th Cir. 2004).

The sexual act need not be committed in the workplace, however, to have consequences there. In *Meritor*, the "respondent testified that during her probationary period as a teller-trainee, Taylor treated her in a fatherly way and made no sexual advances. Shortly thereafter, however, he invited her out to dinner and, during the course of the meal, suggested that they go to a motel to have sexual relations. At first she refused, but out of what she described as fear of losing her job she eventually agreed." 477 U.S. at 60; see *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 409-10 (1st Cir. 2002). But at the very least the harassment must, as in *Meritor*, be an episode in a relationship that began and grew in the workplace. Cf. *Whitaker v. Carney*, 778 F.2d 216, 221 (5th Cir. 1985). Had Nayman met Doe on the last day of either his or her employment at the ice cream parlor and later asked her for a date that eventually culminated in sexual intercourse, the connection to the workplace would have been too attenuated to constitute workplace harassment. Cf. *Hunter v. Countryside Association for the Handicapped, Inc.*, 723 F. Supp. 1277, 1278 (N.D. Ill. 1989). It would have been no different from his asking a customer for a date.

But that is not what happened. The relationship began with flirtatious talk and erotic touching in the workplace

and continued there for nine months before Nayman and Doe had sex. Nor did it end with their sexual encounter. She continued working at the ice cream parlor in close proximity with her harasser—indeed under his supervision—after the statutory rape, though for less than two weeks. See *Fuller v. City of Oakland*, 47 F.3d 1522, 1527-28 (9th Cir. 1995). Because her consent to have sex with Nayman was, as a matter of law, ineffectual, this is a case of a worker subjected to nonconsensual sex by a supervisor or at least quasi-supervisor (see below) during, as well as arising from, the employment relation. That is a sufficiently strong case of workplace sexual harassment to withstand summary judgment. Whether it is harassment *by the employer* is a separate question.

We shall turn to that question momentarily but first we want to make clear that we are not holding that Nayman's behavior with Doe and the other underage girls *before* that behavior culminated in sexual intercourse was sexual harassment per se. That was not criminal conduct. Nor are American teenage girls such blushing violets that sexual badinage is harassment per se. The criminal laws of the states recognize the distinction between talk and casual physical contact on the one hand and sexual intercourse on the other; and so should federal courts in Title VII cases. The plaintiff presented evidence that she was disturbed by the defendant's attentions in the workplace but did not feel free to resist them for fear of losing her job (and it was her first job), but that evidence was contested and so its significance remains to be determined.

But was the defendant *responsible* for Nayman's conduct? The general rule, crudely stated however (as we are about to see), is that if the harasser is a supervisor, the employer is strictly liable for the harassment, *Burlington*

*Industries, Inc. v. Ellerth*, 524 U.S. 742, 760-65 (1998); *Hall v. Bodine Electric Co.*, 276 F.3d 345, 355 (7th Cir. 2002), while if he is a coworker the employer is liable only if it failed to have and enforce a reasonable policy for preventing harassment, or in short only if it was negligent in failing to protect the plaintiff from predatory coworkers. *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 951-52 (7th Cir. 2005); *Loughman v. Malnati Organization, Inc.*, 395 F.3d 404, 407 (7th Cir. 2005).

The paradigmatic supervisor is an employee who has the authority to fire the plaintiff, e.g., *Savino v. C.P. Hall Co.*, 199 F.3d 925, 932 n. 7 (7th Cir. 1999), because by giving him that authority the employer has armed him to intimidate the employees whom he supervises. *Gawley v. Indiana University*, 276 F.3d 301, 311 (7th Cir. 2001); *Lutkewitte v. Gonzales*, 436 F.3d 248, 259-60 (D.C. Cir. 2006) (concurring opinion). The paradigmatic coworker is a worker of the same status as the plaintiff. The difficulty of classification in this case arises from the fact that Nayman, the shift supervisor, was in between the paradigmatic classes. He had supervisory responsibility in the sense of authority to direct the work of the scoopers, and he was even authorized to issue disciplinary write-ups, but he had no authority to fire them. He was either an elevated coworker or a diminished supervisor. The defendant's brief denies that shift supervisors have any disciplinary authority, but this is one of many factual errors in the brief.

If forced to choose between the two pigeonholes, we would be inclined to call Nayman a supervisor, consistent with *Gawley v. Indiana University*, *supra*, 276 F.3d at 311—though *Hall v. Bodine Electric Co.*, *supra*, 276 F.3d at 355, tugs the other way—because he was often the only supervisory employee present in the ice cream parlor. He was thus

in charge, and had he told his boss that one of the scooper girls was not doing a good job and should be fired, the boss would probably have taken his word for it rather than conduct an investigation, since Doe—a part-time teenage worker—would hardly have been considered a valued employee.

But there is no compelling need to make a dichotomous choice. Simplicity is a value in law, as we have stressed, but it is not the only value. Binary distinctions are not the only ones that judges and juries are capable of making. *Burlington Industries, Inc. v. Ellerth*, *supra*, 524 U.S. at 760-62, along with its companion case, *Faragher v. City of Boca Raton*, 524 U.S. 775, 802-03 (1998), recognizes this in two ways. They distinguish between supervisors who take or threaten to take a "tangible employment action" against a subordinate, such as firing her or denying her a promotion, and supervisors who are merely "aided in accomplishing the tort [i.e., the harassment] by the existence of the agency relation," that is, the supervisor's status as the employer's agent. *Id*. at 801, 807; *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143-46 (2004); *Burlington Industries, Inc. v. Ellerth*, *supra*, 524 U.S. at 760-62. And in adopting the negligence standard to govern the employer's liability for coworker harassment, which requires determining whether "the company was negligent either in discovering or remedying the harassment." *Hall v. Bodine Electric Co.*, *supra*, 276 F.3d at 356, the cases implicitly impose on the employer a higher duty of care to protect its employees against those employees whom the employer has armed with authority, even if it is less than the authority that triggers the employer's strict liability.

Under either approach, even if not strictly liable for harassment by a shift supervisor, still the employer must

exercise greater care than is required in a case of routine harassment by a coworker. How much greater will normally be a jury question, though of course in extreme questions it will be answered by the judge. The defendant was not entitled to summary judgment on the question in this case. The fact that Nayman was often the only supervisor in the ice cream parlor and that the workers he was supervising were for the most part inexperienced teenagers working part time created a risk of harassment by him that required his employer to take greater care than if Nayman had been one of the teenage scoopers. Other shift supervisors were aware of Nayman's sexually suggestive behavior with the teenage scoopers (also that he was an alcoholic) and his practice of inviting them to his apartment. But either they did not report this conduct to their managers as they should have done or the managers took no action because they believed that activity that occurs outside the workplace is none of their business even if it originated in the workplace and had consequences there. No procedures were in force or utilized for protecting girls like the plaintiff from what happened to her, even though it should have been clear that the situation in the store as a result of Nayman's antics was explosive.

An employer of teenagers is not *in loco parentis*, but he acts at his peril if he fails to warn their parents when he knows or should know that their children are at substantial risk of statutory rape by an older, male shift supervisor in circumstances constituting workplace harassment. "[S]exual harassment may be a particular problem in the restaurant industry because restaurants often hire young, inexperienced workers. High employee turnover contributes to the problem, presumably because of monitoring difficulties and the need to train new employees continually . . . . [R]estaurants often try to create an 'entertainment atmo-

sphere' that can cloud the rules for appropriate conduct in the workplace." Jennifer Ann Drobac, "Sex and the Workplace: 'Consenting' Adolescents and a Conflict of Laws," 79 *Wash. L. Rev.* 471, 481 (2004).

In sum, the district judge terminated the case prematurely. But he was correct to allow the defendant access to the plaintiff's psychiatric records. Although there is a psychotherapist-patient privilege in federal cases, *Jaffee v. Redmon*, 518 U.S. 1 (1996), intended like the closely related doctor-patient privilege to avoid deterring people from seeking treatment by fear that by doing so they will incur a disadvantage in litigation, the privilege is not absolute. If a plaintiff by seeking damages for emotional distress places his or her psychological state in issue, the defendant is entitled to discover any records of that state. *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000); see generally Beth S. Frank, Note, "Protecting the Privacy of Sexual Harassment Plaintiffs: The Psychotherapist-Patient Privilege and Recovery of Emotional Distress Damages under the Civil Rights Act of 1991," 79 *Wash. U.L.Q.* 639, 651-57 (2001). Rule 35 of the Federal Rules of Civil Procedure would entitle the defendant to demand that the plaintiff submit to a psychiatric examination, e.g., *S.A. Healy Co. v. Milwaukee Metropolitan Sewerage Dist*., 60 F.3d 305, 309-10 (7th Cir. 1995); see *Havinga v. Crowley Towing & Transp. Co.*, 24 F.3d 1480, 1488 (1st Cir. 1994), the results of which would be available for use by the defendant in discovery and at trial; there is no greater invasion of privacy by making existing records available to the defendant. The judge can seal the plaintiff's psychiatric records and limit their use in the trial (which is public) to the extent that the plaintiff's interest in privacy outweighs the probative value of the information contained in the records. *Northwestern Memorial Hospital v.*

*Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004); *In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1216-17 (D.C. Cir. 2004).

As for the cross-appeal, however, the Roes have a legitimate interest in excluding from the litigation such portions of the records as may refer exclusively to them, for their mental condition is not germane to the plaintiff's lawsuit. They were entitled to intervene to protect that interest, a substantial privacy interest. Fed. R. Civ. P. 24(a)(2); *United States v. Kemper Money Market Fund, Inc.*, 704 F.2d 389, 392 (7th Cir. 1983); *Eng v. Coughlin*, 865 F.2d 521, 526-27 (2d Cir. 1989).

To summarize, the judgment for the defendant is reversed (together with the denial of the Roes' motion to intervene) and the award of costs vacated; the case is remanded for further proceedings consistent with this opinion; and the supplemental claims shall be reinstated.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*