**Reversed and Rendered in Part, Reversed and Remanded in Part, and Opinion filed November 20, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00162-CV

---

## GERARDO SOLIS, OSMIN TURCIOS, CHIPOTLE MEXICAN GRILL OF COLORADO, LLC, AND CHIPOTLE MEXICAN GRILL, INC., Appellants

### V.

## S.V.Z., INDIVIDUALLY AND AS NEXT FRIEND OF A.Z., HER MINOR CHILD, Appellee

---

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2014-69341**

---

### OPINION

This civil case arises out of the commission of multiple criminal acts, the most serious of which involve the repeated sexual assault of a 16-year-old girl by her 26-year-old supervisor. The assaults against the girl were not forcible—she "consented" to the sexual intercourse—but because the girl had not yet attained the legal age of consent, each act of intercourse constituted a statutory rape. *See* Tex. Penal Code

§ 22.011(a)(2); *In re B.W.*, 313 S.W.3d 818, 822 (Tex. 2010) (referring to this penal statute as a "statutory rape statute").

The girl's mother filed suit after learning of the illicit sexual relationship. She asserted three common law claims: the first was against the supervisor for sexual assault; the second was against the supervisor's manager for aiding and abetting in the sexual assaults; and the third was against the restaurant where they worked for sexual assault as well, under a theory that the restaurant was directly liable for the conduct of its vice principal. In addition to these claims, the girl's mother pursued a statutory claim for sexual harassment against the restaurant. The jury returned a verdict in favor of the girl on all of these claims, and the trial court rendered judgment based on the jury's award.

The main issue on appeal concerns the legal effect of the girl's minority. Because the girl was underage, the trial court ruled that her conduct was wholly irrelevant to the jury's determination of liability and actual damages. The trial court accordingly precluded the defense from eliciting testimony about why the girl had consented to a sexual relationship with her supervisor. The trial court also issued a charge instruction stating that the girl's conduct could not be considered for any purpose.

We conclude that the trial court's charge instruction was erroneous and that the jury should have been allowed to hear and consider evidence of the girl's conduct, as that evidence was relevant to the determination of actual damages. Because the erroneous instruction probably led to the rendition of an improper judgment on the common law claim of sexual assault against the supervisor and on the statutory claim of sexual harassment against the restaurant, we conclude that those claims must be remanded for a new trial.

2

As for the remaining common law claims, we conclude that the sexual assault claim against the restaurant is preempted by statute, and that the aiding and abetting claim against the manager must fail because it does not exist under our common law and because no reasons have been given for its recognition in this case. Accordingly, we render take-nothing judgments as to those claims.

## BACKGROUND

After she turned sixteen, A.Z. began working as an entry-level crew member at Chipotle Mexican Grill, the national chain of fast-casual restaurants. Gerardo Solis worked alongside her, also as a crew member. He was married, twenty-five years old, and soon to turn twenty-six.

The first interaction that Solis had with A.Z. occurred after he bumped into her breasts. Solis apologized for the incident, but he used the opportunity to crack jokes and learn more about A.Z. He asked about her favorite restaurant, and he invited her to dine out with him. A.Z. declined the offer, but Solis persisted.

Over the course of more than a month, Solis pleaded with A.Z. nearly fifteen times to go out with him. A.Z. eventually acquiesced. They saw a movie first, and afterwards they ate out. They had two or three more dates, and then Solis kissed A.Z. Soon after that, he began touching her breasts.

At the beginning of their dating relationship, Solis was still just a crew member, but then Chipotle promoted him, first to kitchen manager and then again to service manager. With these more supervisory roles, Solis had the authority to tell A.Z. to come in early if she were needed, to go home early if she were not needed, and what to do when she was on the clock.

Following Solis's promotions, the physical contacts gradually escalated. Solis digitally penetrated A.Z.'s vagina and anus. He performed oral sex on her, which

3

she reciprocated. Then he had sexual intercourse with her. Sometimes they would sneak out to the dumpster area behind the restaurant to have sex. Other times they would have sex in a park. In all, they had sex about forty times, and it was always unprotected.

A.Z. did not reveal the sexual relationship to her mother, S.V.Z. ("Mother"), though Mother nearly discovered the relationship herself. Mother went to the restaurant one evening to pick up A.Z., believing that A.Z. had worked a full shift that day, when in fact A.Z. had spent the day elsewhere with Solis. Mother became distressed when she could not find her daughter, and she asked to speak with the general manager, Osmin Turcios.

Mother told Turcios that she was prepared to call the police to report that her daughter was missing. Turcios responded that there was no need to call the police because a female coworker had already taken A.Z. home. That statement was untrue because Turcios knew that A.Z. was currently with Solis.

After stepping away to a private area, Turcios called Solis and advised him to take A.Z. home because Mother was actively searching for her. A.Z. overheard this conversation because Solis had placed the call on speaker. Heeding Turcios's advice, Solis dropped A.Z. off at her home, before Mother could return home herself. Once home, A.Z. did not reveal to Mother where she had been.

A.Z. continued to work at Chipotle for the next two or three weeks, and then she left the country for a planned vacation. Mother did not accompany A.Z. on the vacation. While A.Z. was abroad, Mother learned from one of A.Z.'s coworkers about A.Z.'s relationship with Solis. Mother returned to the restaurant and accused Turcios of covering up the relationship. Mother again said that she intended to call the police, but she never did. She filed this civil lawsuit instead.

4

A.Z. was, in her own words, "mad" when she learned that Mother had filed the lawsuit, but she never returned to Chipotle after coming home from her vacation. As she explained: "I felt like that was a hostile place to work at. I didn't feel safe."

Chipotle conducted an internal investigation after Mother filed the lawsuit. Solis was terminated as a result of that investigation, though not because of his sexual relationship with A.Z, which he denied having. Solis was terminated because Chipotle determined that he had lied about the extent of his electronic communications with A.Z.

Solis relocated to Mexico after his termination. He did not appear at the trial, but the trial court allowed his discovery responses to be read into evidence. In those responses, Solis invoked his Fifth Amendment privilege against self-incrimination.

A.Z. testified during the trial that Chipotle had a culture of harassment. She said that Turcios and the other managers used security cameras to watch women and comment on their bodies. One of these other managers repeatedly asked A.Z. for a kiss in exchange for her paycheck. Solis also mentioned to her that Turcios talked about wanting to have sex with her once she turned seventeen.

When the questioning turned to Solis, A.Z. denied having had romantic feelings for him: "We didn't have a relationship," she testified. "He used me for sex." A.Z. explained that Solis promised her better work hours and a better schedule in exchange for sex, and that she assented to his advances because she wanted to keep her job: "I just felt like I had to [say yes to his advances]. I was pressured."

A clinical psychologist likened A.Z. to a "rape victim." The psychologist testified that A.Z. endured "very traumatic, very degrading, dehumanizing events." The psychologist testified that A.Z. suffered from crying spells, fatigue, sleeplessness, and anxiety, and that A.Z. experienced "intense feelings of

5

helplessness . . . intense shame, intense guilt." The psychologist also opined: "I have to say, in 30 years of listening to graphic, very graphic cases of incest—violations to people, [A.Z.'s case] was one of the worst, one of the very worst stories I have ever heard."

Not much evidence was admitted to counteract these characterizations. A.Z. briefly acknowledged that she once thought she was "happy" when she was with Solis. The psychologist similarly testified that A.Z. had "pursued" a relationship with Solis, and that A.Z. once "thought she was in love."

Defense counsel sought to expand on this limited testimony—specifically, by showing that A.Z. had desired a relationship with Solis—but in a hearing conducted outside the presence of the jury, the trial court ruled that such evidence would not be admissible until the exemplary damages stage of the trial.

Defense counsel made an offer of proof. Counsel represented that if A.Z. had been cross-examined about her mental state and the broader issue of her consent, the testimony would have established that A.Z. believed that she was in a romantic relationship with Solis; that aside from concealing that relationship from Mother, A.Z. did not think that anything was wrong with her and Solis being together; that A.Z. wanted Solis to divorce his wife; that A.Z. communicated with Solis even after Mother filed the lawsuit; and that A.Z. saved photographs of her and Solis together because the photographs reminded her of happier times.

Among other findings, the jury determined that Solis had sexually assaulted A.Z., that Turcios had aided and abetted in the sexual assaults, and that Chipotle had subjected A.Z. to sexual harassment. The jury also determined that A.Z. should recover $2.29 million in actual damages for the sexual assaults, and more than $2.9 million in actual damages for the sexual harassment. Because this verdict was non-unanimous, the trial never proceeded to the exemplary damages stage.

6

In response to a post-trial motion, which invoked the One Satisfaction Rule, the trial court struck a large portion of the jury's award. The trial court then rendered a final judgment awarding A.Z. nearly $3 million in actual damages, plus attorney's fees.

All parties now appeal from that final judgment.

## ANALYSIS

The parties have collectively raised nearly a dozen issues and cross-issues. We organize those issues around the judgments against each defendant, addressing only those issues necessary to disposition of the appeal.[1] *See* Tex. R. App. P. 47.1.

### I. The Judgment Against Solis

The trial court rendered judgment against Solis based solely on the common law claim of sexual assault. We consider two issues regarding this claim.

We begin with Solis's argument that we should render a take-nothing judgment in his favor because the trial court submitted an immaterial question on liability. *See Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003) ("When a party presents multiple grounds for reversal of a judgment on appeal, appellate courts should first address issues that would require rendition."). After rejecting that argument, we then consider Solis's alternative argument that we should remand the case for a new trial because the trial court reversibly erred in the submission of its charge instruction.

---

[1] The issues we do not consider include the following: whether inflammatory statements by A.Z.'s lawyer denied Solis a fair trial; whether the trial court improperly allowed certain testimony by A.Z.'s clinical psychologist; whether the evidence is sufficient to support the award of damages; whether the judgment improperly awarded prejudgment interest on future damages; whether the trial court erroneously excluded certain text messages; whether a remittitur should be suggested as to A.Z.'s claim of sexual harassment; and whether the trial court improperly applied the One Satisfaction Rule.

7

**A.   The trial court did not abuse its discretion in its submission of the sexual assault question.**

During the charge conference, A.Z. proposed a broad-form question that asked whether Solis's sexual assaults, if any, had proximately caused her damages, if any.[2] A.Z. also proposed that the phrase "sexual assault" should be defined by tracking the elements of the criminal offense for sexual assault of a child. *See* Tex. Penal Code § 22.011(a)(2); *id.* § 22.011(c)(1) (defining "child" as any person younger than seventeen years of age).

Solis lodged two objections to A.Z.'s proposed question. First, he objected that the broad-form submission assumed that he had committed the sexual assaults (notwithstanding the "if any" language). Second, he objected that the proposed question incorporated the elements of a criminal sexual assault instead of the elements of a simple civil assault.

The trial court sustained Solis's first objection but overruled his second objection. The trial court then agreed to submit the sexual assault claim in granulated form, beginning with a predicate question that asked whether Solis had sexually assaulted A.Z., followed later by a separate question that asked whether the sexual assaults had proximately caused A.Z.'s damages, if any. In material part, the predicate question provided as follows:

Did Gerardo Solis intentionally or knowingly sexually assault [A.Z.]?
"Sexual assault" means that a person—
     1.    Intentionally or knowingly—

---

[2] When this lawsuit began, A.Z. was still a minor, which explains why this case is styled with S.V.Z. as the plaintiff and the next friend of A.Z. *See* Tex. R. Civ. P. 44 (providing that minors may sue and be represented by next friends). A.Z. has since become an adult, and for ease of reference, we identify her in this opinion as though she were the plaintiff, instead of Mother.

(A) causes the penetration of the anus or sexual organ of a child by any means;

(B) causes the penetration of the mouth of a child by the sexual organ of the actor; or

(C) causes the sexual organ of a child to contact or penetrate the mouth, anus, [or] sexual organ of another person, including the actor.

Solis now argues that the trial court reversibly erred by submitting the predicate question with the criminal elements of a sexual assault. He contends that the criminal elements were inappropriate because criminal offenses do not give rise to private rights of action.

Contrary to Solis's suggestions, a private right of action can arise out of the commission of certain offenses, including the sexual assault of a child. Texas courts have long recognized a common law right of recovery in such cases. *See Robinson v. Moore*, 408 S.W.2d 582, 583–84 (Tex. Civ. App.—San Antonio 1966, no writ) (holding that the trial court erred by dismissing a civil claim arising out of the statutory rape of a child); *Altman v. Eckermann*, 132 S.W. 523, 523–24 (Tex. Civ. App. 1910) (holding that the trial court erred by dismissing a civil claim arising out of the forcible rape of a child). The legislature has also blessed these causes of action by enacting statutes that recognize that the sexual assault of a child can result in civil liability. *See* Tex. Civ. Prac. & Rem. Code § 16.0045(a)(1) (establishing a fifteen-year statute of limitations for a personal-injury suit arising out of the sexual assault of a child); *id.* § 61.0021(a)(2)(A) (providing that attachment is available in such cases).

Solis argues next that even if there is a viable right of action against him, the trial court abused its discretion by refusing to submit a liability question that tracked the elements of a civil assault.

9

There are two essential elements to a civil assault: (1) the defendant intentionally or knowingly caused physical contact with the plaintiff, and (2) the defendant knew or reasonably should have believed that the plaintiff would regard that contact as offensive or provocative. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012).

These elements are appropriate when a civil claim for assault is based on the unwanted sexual touching of an adult. *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 803 (Tex. 2010) (holding that such facts give rise to a simple assault). But the same cannot be said when the claim is based on the statutory rape of a sixteen-year-old girl. The problem lies with the "offensive or provocative" element and the related legislative judgments regarding minors and sex.

Our legislature has determined that minors under the age of seventeen lack the maturity and capacity to engage in sexual relations. *See In re E.N.C.*, 384 S.W.3d 796, 804 n.11 (Tex. 2012) ("In Texas, the age of consent is seventeen."). This determination is reflected in two of our criminal laws. The first law provides that a person who has sex with a minor younger than fourteen is strictly liable for a sexual assault, even if the minor assented in fact to the sexual relationship, and even if the person did not know the age of the minor at the time of the offense. *See* Tex. Penal Code § 22.021(a)(2)(B). The second law proscribes sexual relations with a minor between the ages of fourteen and seventeen, although that law has two exceptions to criminal liability. *Id.* § 22.011(a)(2). A defense is available under that law if the sexual partner is the spouse of the minor or no more than three years older than the minor. *Id.* § 22.011(e). Outside of those exceptions, sex with a minor between the ages of fourteen and seventeen results in strict liability. *See Fleming v. State*, 455 S.W.3d 577, 581–82 (Tex. Crim. App. 2014). Together, these two laws manifest a

legislative judgment that any sexual contact with a minor under the age of seventeen is offensive and provocative as a matter of law, unless an exception applies.

The evidence in this case conclusively established that Solis could not claim an exception. He was married to someone other than A.Z., and he was roughly ten years older than A.Z. Thus, for as long as A.Z. remained under the age of seventeen, the law would not tolerate any sexual contacts that Solis had with her. Accordingly, if a factfinder determined that those contacts actually occurred, there would be no need to obtain an explicit finding that Solis knew or reasonably should have known that the contacts would be regarded as offensive or provocative.

The trial court's charge correctly applied the law on this point. The trial court's predicate question asked whether Solis sexually assaulted A.Z., and a subsequent question asked whether those assaults proximately caused A.Z.'s damages, which ensured that Solis was not strictly liable for civil damages. Because the trial court did not abuse its discretion by refusing to submit a question that tracked the elements of a simple civil assault, we conclude that the trial court's liability question is not immaterial and that Solis is not entitled to rendition of judgment.

### B. The trial court abused its discretion in the submission of the charge instruction.

In addition to the liability question just discussed, A.Z. proposed the following charge instruction during the charge conference: "Under Texas law 16-year-old [A.Z.] was under the age of consent at all times during the events in question in this case. Accordingly, in answering the following questions you shall not consider any alleged or actual acts, conduct, behavior, cooperation or omissions of [A.Z.]."

Solis objected to the instruction, arguing that it prevented the jury from considering A.Z.'s willing participation in the sexual relationship, which Solis

characterized as a mitigating circumstance for purposes of damages. The trial court overruled the objection and submitted the instruction to the jury. Solis now argues that the trial court reversibly erred and that the sexual assault claim should be remanded for a new trial.

We begin our analysis by identifying the two types of consent that are referenced in the instruction. The phrase "age of consent" refers to legal consent, which is a term of art that recognizes the maturity and capacity of a person to engage in sexual relations. *See In re B.W.*, 313 S.W.3d at 820. Legal consent must be distinguished from factual consent, which is just consent in its ordinary usage—i.e., "permission, willingness, voluntariness, agreement, acquiescence, or assent." *See May v. State*, 919 S.W.2d 422, 424 (Tex. Crim. App. 1996); *see also* Tex. Penal Code § 1.07(a)(11) (defining "consent" as "assent in fact"). The phrase "acts, conduct, behavior, cooperation or omissions of [A.Z.]" refers to this factual type of consent.

Solis argues that the charge instruction was erroneous because it precluded the consideration of A.Z.'s factual consent, which he contends is relevant to the recovery of actual damages. That argument finds support in an analogous criminal case out of Texas, which held that in a prosecution for statutory rape, evidence of the minor's factual consent would be relevant for purposes of mitigating the defendant's punishment. *See Eaves v. State*, 141 S.W.3d 686, 692–94 (Tex. App.— Texarkana 2004, pet. ref'd) (holding that the trial court reversibly erred during the punishment phase of trial by excluding evidence that the minor had desired a sexual relationship with the defendant).

As for civil cases, no Texas court has spoken on this issue, but there are authorities from other jurisdictions that hold that a minor's factual consent is relevant to the assessment of damages. *See Doe v. Oberweis Dairy*, 456 F.3d 704, 714 (7th

Cir. 2006) ("For completeness we add that although consent to sexual relations with a coworker or supervisor is not a defense in a Title VII suit for sexual harassment brought by a plaintiff who was underage when the conduct alleged to constitute harassment occurred, this does not mean that the conduct of the plaintiff can never be used to reduce the defendant's damages in such a case."); *accord Doe v. Mama Taori's Premium Pizza, LLC*, No. M1998-00992-COA-R9-CV, 2001 WL 327906, at *7 (Tenn. App. Apr. 5, 2001); *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 450–51 (7th Cir. 2000); *Parsons v. Parker*, 170 S.E. 1, 3 (Va. 1933).

These authorities appear to be driven by the rationale that fundamental fairness requires the jury's consideration of all the surrounding circumstances, including the minor's factual consent. *See Doe ex rel. Roe v. Orangeburg Cnty. Sch. Dist. No. 2*, 518 S.E.2d 259, 261 (S.C. 1999) ("Unlike the victim in a criminal case, the plaintiff in a civil damage action is 'on trial' in the sense that he or she is an actual party seeking affirmative relief from another party. Such plaintiff is a voluntary participant, with strong financial incentive to shape the evidence that determines the outcome. It is antithetical to principles of fair trial that one party may seek recovery from another based on evidence it selects while precluding opposing relevant evidence on grounds of prejudice."); *accord L.K. v. Reed*, 631 So. 2d 604, 607 (La. App. 1994).

A.Z. has not cited to any authority (and we are aware of none) in which a court has held that a minor's factual consent is irrelevant to the determination of actual damages. In the absence of such authority, A.Z. offers two responses to the opposing authorities that hold that a jury should be allowed to consider evidence of the minor's factual consent.

First, in response to the criminal case from Texas, A.Z. proposes that if a minor's factual consent is a mitigating circumstance to be considered during the

13

punishment stage of a criminal trial, then the corollary of that rule is that in a bifurcated civil trial, a minor's factual consent should be considered during the exemplary damages stage, but not the compensatory damages stage. A.Z. then argues that the trial court's charge instruction was consistent with this corollary because the instruction was given during the compensatory damages stage, and because the trial court had already ruled that evidence of A.Z.'s factual consent would be admissible during the exemplary damages stage, should that stage be reached.

A.Z.'s proposed corollary is unsound. Compensatory damages redress concrete losses caused by the defendant's wrongful conduct, whereas exemplary damages are aimed at deterrence and retribution. *See Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 873 (Tex. 2017). Evidence of a minor's factual consent is relevant to compensatory damages because such evidence shows whether the minor has suffered actual injuries in the first place.

Second, in response to the civil authorities, A.Z. argues that if a minor's factual consent is relevant to compensatory damages, then Solis waived his challenge to the charge instruction because he did not request a separate instruction on A.Z.'s comparative fault or proportionate responsibility. This argument is fatally flawed. A minor cannot be at fault in her own statutory rape. *Cf. In re B.W.*, 313 S.W.3d at 826 (holding that a thirteen-year-old girl cannot be charged with prostitution because children are the victims, rather than the perpetrators, of prostitution); *Soliz v. State*, 293 S.W.2d 662, 662 (Tex. Crim. App. 1956) (holding that the victim in a statutory rape is not an accomplice witness). Also, the waiver point is refuted by the record: Solis submitted a written objection that directly addressed this issue, and that objection was repeated during the charge conference.

14

We agree with the line of authority that holds that a minor's factual consent is relevant to the assessment of damages. We therefore hold that the trial court abused its discretion by submitting the challenged instruction.

We next consider whether the charge instruction resulted in harm. When a trial court commits charge error, the judgment must be reversed if the error "probably caused the rendition of an improper judgment." *See* Tex. R. App. P. 44.1(a)(1). Charge error is generally considered harmful if the error relates to a contested, critical issue. *See Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012).

We begin by noting that the same legal error that appeared in the charge instruction also formed the basis of a key evidentiary ruling. Specifically, the trial court ruled that Solis could not elicit testimony about A.Z.'s subjective feelings because A.Z. had been below the age of consent during the times in question. The result of this ruling was that A.Z.'s lawyer largely controlled the scope of her testimony, which skewed the trial in A.Z.'s favor. A.Z. testified that she assented to Solis's sexual advances solely because she wanted to keep her job, and she specifically denied having had a romantic relationship with him.

There was some conflicting evidence on this point, but the evidence was not fully developed. The jury heard that A.Z. concealed her dating relationship from her mother. The jury also heard limited testimony that A.Z. was "happy" with Solis, that she "pursued" a relationship with him, and that she "thought she was in love." Solis was not permitted to expand on this testimony, and the trial court's erroneous charge instruction categorically prohibited the jury from considering it.

Had the jury been allowed to consider evidence of A.Z.'s factual consent, there is a reasonable probability that its findings on damages would have been different. The jury could have found that A.Z. was in a romantic relationship with

Solis (contrary to her testimony), which might have mitigated any damages resulting from Solis's sexual assaults.

We conclude that the trial court's charge instruction probably caused the rendition of an improper judgment, and that the judgment should be reversed for a new trial on the claim of sexual assault.

## II.    The Judgment Against Chipotle

The trial court rendered judgment against Chipotle on two separate claims: the first was a common law claim for sexual assault, which was based on a vice principal theory of liability; and the second was a statutory claim for sexual harassment, which was based on the Texas Commission of Human Rights Act ("TCHRA"). We address these two claims in reverse order.

We consider four issues with respect to the statutory claim of sexual harassment. In the first of these issues, Chipotle argues that we should vacate the trial court's judgment and dismiss the claim for lack of jurisdiction because A.Z. did not timely file her administrative complaint. In the second and third issues, Chipotle argues that we should render judgment in its favor because the trial court omitted an essential element from the liability question, or in the alternative, because the evidence conclusively established an affirmative defense. In the fourth issue, Chipotle argues that we should remand the claim for a new trial because the same charge instruction that caused an improper judgment on the sexual assault claim also caused an improper judgment on the sexual harassment claim.

As for the common law claim of sexual assault, we consider just a single issue: whether we should render judgment in Chipotle's favor because the claim is preempted by TCHRA.

16

**A.    The trial court did not lack jurisdiction over the sexual harassment claim.**

TCHRA requires a person to file an administrative complaint no later than 180 days after the date of the unlawful employment practice. *See* Tex. Labor Code § 21.202(a). A.Z. did not strictly comply with this deadline. She filed her complaint before her eighteenth birthday, but more than 180 days after her resignation, which was the last possible date on which the harassment could have occurred.

Chipotle now argues for the first time on appeal—and in a letter brief filed just one week before oral argument—that the trial court lacked jurisdiction over the harassment claim because A.Z. did not file her administrative complaint within TCHRA's statute of limitations. A.Z. counters that the 180-day deadline is not jurisdictional and that Chipotle waived the limitations defense by not asserting it in the trial court. A.Z. also contends that even if the 180-day deadline is jurisdictional, the statute of limitations was tolled because of her minority.

We are duty-bound to determine questions of jurisdiction, so we begin with that threshold issue. *See In re City of Dallas*, 501 S.W.3d 71, 73 (Tex. 2016) (orig. proceeding) (per curiam).

**1.    The 180-day deadline is jurisdictional.**

There are two conflicting lines of authority in this jurisdictional dispute. On the one hand, there is a trio of cases, beginning with *Schroeder v. Texas Iron Works, Inc.*, that squarely hold that TCHRA's 180-day deadline is jurisdictional, even in a suit against a private party. *See Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 486–88 (Tex. 1991), *overruled on other grounds by In re USAA*, 307 S.W.3d 299 (Tex. 2010) (orig. proceeding); *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996) (per curiam); *Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 929 n.3 (Tex. 1996).

17

On the other hand, there are more recent authorities, beginning with *Dubai Petroleum Co. v. Kazi*, and all postdating that earlier trio of cases, that hold that statutory prerequisites to suit should not be regarded as jurisdictional, unless the legislature has clearly stated otherwise. *See Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76 (Tex. 2000); *City of DeSoto v. White*, 288 S.W.3d 389, 393–94 (Tex. 2009); *In re USAA*, 307 S.W.3d at 306–07.

The conflict persists because the Texas Supreme Court has not overruled the *Schroeder* line of authority, and because the legislature has only declared that statutory prerequisites to suit are jurisdictional in suits against a governmental entity. *See* Tex. Gov't Code § 311.034. The legislature has made no similar declarations regarding suits against a private party, or regarding TCHRA's 180-day deadline more specifically.

The Supreme Court had an opportunity to revisit *Schroeder* in *Prairie View A&M University v. Chatha*, 381 S.W.3d 500 (Tex. 2012). That case also involved TCHRA's 180-day deadline, but because the suit there was against a governmental entity, and therefore controlled by a different statute, the Court expressly declined to decide whether the 180-day deadline was jurisdictional "in nature"—i.e., in suits against a private party as well. *Id.* at 510 n.15. There was a dissent, however, and the dissent would have overruled *Schroeder* and its progeny as being "inconsistent" with the rule announced in *Dubai*. *Id.* at 519 (Jefferson, C.J., dissenting).

Against this legal backdrop, Chipotle urges us to follow *Schroeder* and A.Z. urges us to follow *Dubai*. We feel bound by *Schroeder*. Even though we agree with A.Z. that the specific holding in *Schroeder* is completely irreconcilable with the broader rule announced in *Dubai*, we have no authority to abrogate or modify established precedent, especially after the Supreme Court declined to do so in *Chatha*. *See In re Smith Barney, Inc.*, 975 S.W.2d 593, 598 (Tex. 1998) (orig.

18

proceeding) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

The Supreme Court should overrule *Schroeder*, but until it revisits *Schroeder* again, or the legislature supersedes *Schroeder* by statute, we conclude that TCHRA's 180-day deadline is jurisdictional. *See Free v. Granite Publ'ns, L.L.C.*, 555 S.W.3d 376, 381 (Tex. App.—Austin 2018, no pet.) (following *Schroeder* instead of *Dubai*); *Czerwinski v. Univ. of Tex. Health Science Ctr. at Houston Sch. of Nursing*, 116 S.W.3d 119, 122 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (same).

This conclusion means that Chipotle could not waive its limitations defense, but it does not mean that the trial court was necessarily deprived of jurisdiction. We must also consider A.Z.'s tolling argument.

### 2. The limitations period was tolled.

A.Z. relies on section 16.001 of the Civil Practice and Remedies Code, which provides as follows:

> (a) For purposes of this subchapter, a person is under a legal disability if the person is:
>> (1) younger than 18 years of age, regardless of whether the person is married; or
>> (2) of unsound mind.
> (b) If a person entitled to bring a personal action is under a legal disability when the cause of action accrues, the time of the disability is not included in a limitations period.

Citing this statute, A.Z. asserts that she was under a legal disability when her harassment claim accrued because she was a minor for the entire time that she was employed by Chipotle. She then contends that her limitations period was tolled until

19

she reached the age of majority, when her legal disability was finally removed. Because A.Z. filed her administrative complaint before she reached the age of majority, she argues that her claim is not barred by limitations and that the trial court was not deprived of jurisdiction.

Chipotle responds that the scope of section 16.001 is not so broad. More specifically, Chipotle argues that section 16.001 applies only to the limitations periods contained in chapter 16, subchapter A of the Civil Practice and Remedies Code, where the statute itself is located. Because TCHRA appears in a different code entirely, Chipotle contends that section 16.001 does not toll TCHRA's 180-day deadline.

The parties' disagreement raises a question of statutory interpretation, for which our review is de novo. *See Sommers for Ala. & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 754 (Tex. 2017). Our practice when interpreting a statute is to give effect to the legislature's intent by applying the plain meaning of the words appearing in the statute. *See State v. Shumake*, 199 S.W.3d 279, 287 (Tex. 2006). When the text is clear, the text is determinative of that intent. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009).

The only part of section 16.001 that operates as a tolling provision is subsection (b), and that provision is triggered when a person under a legal disability brings a "personal action." *See* Tex. Civ. Prac. & Rem. Code § 16.001(b). Because the statute does not define the phrase "personal action," we apply its ordinary meaning, which is this: "an action brought for the recovery of debts, personal property, or damages arising from any cause." *See* Black's Law Dictionary 31 (7th ed. 1999).

This broad definition is consistent with the other statutes organized under subchapter A, which is labeled "Limitations of Personal Actions." These statutes

20

prescribe the limitations periods for many different types of actions, including those involving debts, personal property, and personal injury. *See* Tex. Civ. Prac. & Rem. Code §§ 16.003, 16.004. Because the Supreme Court has recognized that a harassment claim under TCHRA is a specialized form of personal-injury suit, we conclude that a harassment claim under TCHRA qualifies as a "personal action" for purposes of section 16.001. *See Waffle House*, 313 S.W.3d at 805.

Chipotle counters that this interpretation effectively nullifies the preliminary text of section 16.001, which begins with the phrase "For the purposes of this subchapter . . . ." But that text is contained solely within subsection (a), which merely defines when a person is under "a legal disability." *See* Tex. Civ. Prac. & Rem. Code § 16.001(a). Our interpretation of subsection (b) does not disturb the definition under subsection (a). Nor does it disturb the broader definition of "a legal disability" in subchapter B, which the legislature clearly intended to be separate. *Id.* § 16.022(a)(3) (providing that for purposes of real property actions, but not personal actions, service in the armed forces during a time of war is also a legal disability).

Chipotle also argues that our interpretation conflicts with *Martinez v. Val Verde County Hospital District*, 140 S.W.3d 370 (Tex. 2004). We disagree for at least two reasons.

First, the issue in *Martinez* concerned a notice requirement under the Texas Tort Claims Act, not a statute of limitations under TCHRA. The Supreme Court did not even mention TCHRA in its opinion. Therefore, *Martinez* has limited applicability to this case.

Second, the Court in *Martinez* made no holding with respect to section 16.001. The Court only referred to section 16.001 in dicta because of a concession made by the plaintiffs: "They concede that because section 16.001 expressly applies only to limitations periods contained in chapter 16, subchapter A of the Texas Civil Practice

21

and Remedies Code, where it is located, it cannot toll the notice period under the Tort Claims Act, which is located in chapter 101, subchapter D of the Code." *Id.* at 372. The Court expressed no opinion on whether this concession was actually correct. More importantly, the Court expressed no opinion as to the meaning of "personal action."

For these reasons, we do not agree with Chipotle that section 16.001 cannot apply to limitations periods appearing in TCHRA. The legislature did not expressly exclude TCHRA from the scope of section 16.001. Similarly, the legislature did not indicate in TCHRA that statutory tolling should be prohibited in claims asserted under TCHRA. *See In re USAA*, 307 S.W.3d at 311 ("Had the Legislature wanted to prohibit statutory tolling, it could have done so, but TCHRA is devoid of any such indication.").

We conclude that the limitations period on A.Z.'s harassment claim was tolled during the period of her minority, and that her administrative complaint was timely because it was filed before she reached the age of eighteen. *See* Tex. Civ. Prac. & Rem. Code § 16.001(b). Therefore, we overrule Chipotle's jurisdictional challenge.

### B. The trial court did not abuse its discretion in its submission of the sexual harassment question.

When a sexual harassment claim is based on a hostile work environment, the plaintiff must generally prove the following essential elements: (1) the plaintiff was subjected to unwelcome sexual harassment by a supervisory employee, (2) the harassment occurred because of the plaintiff's sex, (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile work environment, and (4) there is some basis for holding the employer liable for the conduct of the supervisory employee. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018).

The trial court's sexual harassment question largely tracked these elements, with one notable exception. Over Chipotle's objection, the trial court did not require the jury to find that A.Z. regarded her harassment as "unwelcome." Chipotle now argues that without the "unwelcomeness" element, the jury's finding is immaterial and a take-nothing judgment should be rendered.

We begin by clarifying the scope of A.Z.'s harassment claim. A.Z. presented evidence about various examples of workplace harassment, including testimony that Turcios improperly surveilled and commented on women, that another manager (not Solis) requested kisses from A.Z. in exchange for a paycheck, and that Solis sexually assaulted her. A.Z. based her harassment claim on just the sexual assaults by Solis. And during closing arguments, her lawyer referred exclusively to these sexual assaults when discussing the factual basis of the harassment claim. *See Waffle House*, 313 S.W.3d at 811 (considering the closing arguments when discerning the nature of the claim asserted).

Insofar as the two claims are based on the same set of facts, our charge-error analysis of the harassment claim does not differ from our charge-error analysis of the assault claim.

Our analysis of the assault claim turned on the legislative judgment regarding the age of consent. We explained that because A.Z. was below the age of consent, any sexual contacts that Solis had with her were improper, unless an exception applied. And because no exception could apply to Solis, we held that any sexual contacts that actually occurred between them were offensive and provocative as a matter of law. Thus, the jury only needed to determine whether the sexual contacts occurred as alleged, not whether a reasonable person would have regarded those contacts as offensive or provocative.

23

We apply the same rule of decision with harassment claims under TCHRA. Indeed, that is how federal courts approach like claims under Title VII, which TCHRA was enacted to track. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012) ("Because one of the purposes of the TCHRA is to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964, we have consistently held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA."); *Oberweis Dairy*, 456 F.3d at 713 ("Federal courts, rather than deciding whether a particular Title VII minor plaintiff was capable of 'welcoming' the sexual advances of an older man, should defer to the judgment of average maturity in sexual matters that is reflected in the age of consent in the state in which the plaintiff is employed. That age of consent should thus be the rule of decision in Title VII cases.").

Because A.Z. could not legally consent to a sexual relationship with Solis for as long as she remained under the age of seventeen, the law would not recognize that she was mature enough to welcome his sexual advances, even though she assented in fact to those advances. *See Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1227 (7th Cir. 1997) ("If elementary school children cannot be said to consent to sex in a criminal context, they similarly cannot be said to welcome it in a civil context. To find otherwise would be incongruous."). It follows that the trial court did not abuse its discretion by omitting the "unwelcomeness" element from the harassment question. *Id.* at 1227–28 (holding in a Title IX case involving a thirteen-year-old girl that the trial court reversibly erred by submitting the "unwelcomeness" issue to the jury).

## C. Chipotle's affirmative defense is precluded by an unchallenged finding of constructive discharge.

Chipotle's next set of arguments pertains to the affirmative defense established in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and its companion case, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Under that defense, an employer is not liable for a harassment claim based on a hostile work environment if the following two elements are proven: (1) the employer exercised reasonable care to prevent and correct promptly the harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See City of Waco v. Lopez*, 259 S.W.3d 147, 151 n.3 (Tex. 2008) (recognizing the defense in cases involving TCHRA).

Chipotle sought to submit the *Faragher/Ellerth* defense to the jury, but for two reasons, the trial court refused to do so. First, the trial court held that Chipotle had not pleaded the defense in its answer. Second, the trial court held that because an employer owes a "higher duty" to minors in the workplace, the defense would not apply when the employee in question is a sixteen-year-old girl.

Disputing these rulings, Chipotle argues that the defense was tried by consent, and that there is no precedent for the trial court's finding of a "higher duty" for employers. Chipotle then argues that judgment should be rendered in its favor because the evidence conclusively established that Chipotle had implemented an anti-harassment policy and that A.Z. had failed to avail herself of that policy by not reporting Solis's harassment.

A.Z. responds that we need not consider these points because she obtained a jury finding that she was constructively discharged, which precludes the

*Faragher/Ellerth* defense, and Chipotle failed to challenge that finding on appeal. We agree with A.Z.

The defense is unavailable "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *See Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765. A constructive discharge qualifies as an adverse personnel action under TCHRA if the employer made working conditions so intolerable that a reasonable person would feel compelled to resign. *See Waffle House*, 313 S.W.3d at 805.

The jury found that A.Z. was constructively discharged, and Chipotle did not challenge that finding in its opening brief. When A.Z. drew attention to this omission in her appellee's brief, Chipotle filed a reply brief, arguing that it had no obligation to challenge that finding because the jury never would have reached the constructive discharge question if it had returned an affirmative answer under the *Faragher/Ellerth* defense. This point is unpersuasive. The jury would have reached the constructive discharge question in any event because a constructive discharge counters the affirmative defense. *See Dillard Dep't Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 410 (Tex. App.—El Paso 2002, pet. denied) ("Having agreed there was sufficient evidence to sustain the jury's finding of constructive discharge, we find this defense was unavailable to Dillard's."); *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 473 (Tex. App.—Austin 2000, pet. denied) ("Owing to Itz's constructive discharge, the defense is not available to Wal-Mart in this instance.").

Because Chipotle did not challenge the finding of constructive discharge in its opening brief, we need not consider Chipotle's rendition argument that the evidence conclusively established the *Faragher/Ellerth* defense.

26

**D.** **The trial court's erroneous charge instruction probably caused the rendition of an improper judgment on the sexual harassment claim.**

In its next issue, Chipotle argues that we should remand the sexual harassment claim for a new trial because of the trial court's erroneous charge instruction. Having previously determined in Part I.B of this opinion that the charge instruction was erroneous, we now consider whether it was harmful with respect to the sexual harassment claim. We conclude that it was.

The charge instruction prohibited the jury from giving effect to the evidence that A.Z. factually consented to a sexual relationship with Solis. Had the jury been allowed to consider that evidence, the jury may have concluded that her work environment was not as hostile as she had claimed, which in turn may have resulted in a different assessment of damages.

Consistent with our earlier analysis, we conclude that the trial court's charge instruction probably caused the rendition of an improper judgment, and that the judgment should be reversed for a new trial on the claim of sexual harassment.

**E.** **The common law claim of sexual assault against Chipotle is preempted by TCHRA.**

Chipotle argues next that A.Z.'s common law claim of sexual assault is preempted by her statutory claim of sexual harassment because both claims are based on the same underlying facts.

Our preemption analysis is guided by *B.C. v. Steak N Shake Operations, Inc.*, 512 S.W.3d 276 (Tex. 2017). In that case, the plaintiff was sexually assaulted at work when her supervisor exposed himself and attempted to have sex with her against her consent. *Id.* at 278. The plaintiff alleged a common law theory of recovery, and like A.Z., she asserted that her employer was directly liable for her supervisor's tort because her supervisor was a vice principal. *Id.* The trial court

27

dismissed the claim, however, and the court of appeals affirmed, having decided that the claim was preempted by TCHRA. *Id.* at 279.

The Texas Supreme Court reversed. In holding that the plaintiff's claim was not preempted, the Court explained that TCHRA was not enacted to provide for the "wholesale abrogation of the common law tort of assault when the assault occurs in the workplace." *Id.* at 284.

A.Z. seizes on this holding, and argues that her common law claim is not preempted either. Under her reading of *Steak N Shake*, TCHRA will never preempt a common law claim of assault when the plaintiff asserts that her employer is directly liable for the intentional tort of a vice principal.

A.Z.'s reading of *Steak N Shake* goes too far. The Court did not forge a blanket exception to the preemptive effect of TCHRA, like it did, for example, in the workers' compensation context. *See Medina v. Herrera*, 927 S.W.2d 597, 600 (1996) (holding that the exclusive remedy provision under the Texas Workers' Compensation Act does not apply to intentional torts attributable directly to an employer under a vice principal theory of liability). Instead, the Court based its holding on the individual facts of the case.

The Court considered six nonexclusive factors in its preemption analysis: (1) whether the plaintiff's "supervisor offered her a promotion or tied sexual favors to job performance"; (2) whether "her supervisor's actions had the purpose or effect of unreasonably interfering with [her] work performance or creating an intimidating, hostile, or offensive working environment"; (3) whether "there was any discussion of a sexual nature or any actions by her supervisor that could be interpreted in a sexual way prior to the alleged . . . assault"; (4) whether "her supervisor's behavior was part of a pattern"; (5) whether "she witness[ed] or report[ed] any prior assaultive behavior by her supervisor or any other . . . manager"; and (6) whether she

28

"allege[d] that [her employer] is liable for fostering or tolerating a hostile work environment, a wrong the TCHRA was intended to remedy." *See Steak N Shake*, 512 S.W.3d at 283–84.

Because all six of these factors were absent in *Steak N Shake*, the Court concluded that the plaintiff's claim sounded in sexual assault, rather than sexual harassment, and therefore, the Court held that the claim was not preempted by TCHRA. *Id.* at 284 ("B.C.'s claim is not an effort to repackage harassment into assault so as to recover under the common law. The essence of B.C.'s claim *is* assault.").

By contrast, all six factors are present here. A.Z. testified that Solis promised her better work hours and a better work schedule if she had sex with him (Factor 1); that she felt pressured to assent to Solis's sexual advances because she wanted to keep her job (Factor 2); that Solis bumped into her breasts when they first met, and then he persistently asked her out on a date nearly fifteen times over the course of a month (Factor 3); that Solis sexually assaulted her forty times (Factor 4); that other managers made sexual comments about women in her presence, and that one manager asked her for a kiss in exchange for her paycheck (Factor 5). And she specifically asserted a TCHRA claim for sexual harassment against Chipotle (Factor 6).

A.Z.'s litigation strategy provides additional confirmation that her statutory claim for sexual harassment is factually related to her common law claim for sexual assault. As we previously discussed in Part II.B of this opinion, A.Z. proposed her jury question for sexual harassment without the "unwelcomeness" element that is traditionally required in harassment cases. When Chipotle objected to the omission of that element, A.Z. responded that the element should not be submitted because, as a matter of law, she could not welcome Solis's sexual advances for as long as she

29

remained under the age of consent. This litigation strategy demonstrates that A.Z.'s statutory claim for sexual harassment is premised on the exact same facts that underlie her common law claim for sexual assault. TCHRA does not allow for the dual recovery of such factually related claims. *Id.* at 285.

Based on this record, we conclude that A.Z.'s common law claim sounds in sexual harassment, and therefore, it is preempted by TCHRA.

## III.   The Judgment Against Turcios

We only consider two issues presented by Turcios. In the first issue, we consider whether a common law claim for aiding and abetting should be recognized in Texas. After answering that question in the negative, we then consider whether there is any other basis for Turcios's liability.

### A.   Aiding and abetting is not recognized under our common law.

A.Z. originally asserted a claim of civil conspiracy against Turcios, but after resting her case in chief, she nonsuited her conspiracy claim and amended her pleadings to assert a claim of aiding and abetting instead.

During the charge conference, Turcios objected to the submission of A.Z.'s aiding and abetting claim on the ground that there is no such cause of action in Texas. A.Z. responded that the claim has been recognized before, citing *Stein v. Meachum*, 748 S.W.2d 516 (Tex. App.—Dallas 1988, no writ), and section 876 of the Second Restatement of Torts. The trial court agreed with A.Z. and overruled the objection.

The trial court's ruling was erroneous. Eight years after *Stein*, the Texas Supreme Court declined to adopt section 876 of the Restatement, and the Court specifically pronounced that the viability of this claim was "an open question." *See Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex. 1996). That pronouncement contradicts the conclusion in *Stein* that the claim is recognized in Texas. *Cf. Rice v.*

*Rice*, 533 S.W.3d 58, 62 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("The Texas Supreme Court's pronouncement in *Kinsel* that the viability of a Texas tortious-interference-with-inheritance claim is 'an open question' contradicts the earlier conclusion of the First and Fourteenth Courts of Appeals 'that a cause of action for tortious interference with inheritance rights exists in Texas.'").

The Supreme Court has yet to settle this open question. In *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co.*, 51 S.W.3d 573, 583 n.7 (Tex. 2001), the Court declined to answer whether a claim for aiding and abetting should exist separate and apart from a claim for civil conspiracy. And even more recently, in *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017), the Court reiterated that it "has not expressly decided whether Texas recognizes a cause of action for aiding and abetting."

Since *Parker*, we have only addressed a claim for aiding and abetting in two cases. *See Jessen v. Duvall*, No. 14-16-00869-CV, 2018 WL 1004659, at \*7 (Tex. App.—Houston [14th Dist.] Feb. 22, 2018, no pet.) (mem. op.); *Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*, 525 S.W.3d 875, 882 (Tex. App.—Houston [14th Dist.] 2017, no pet.). But in neither case were we asked to decide whether the claim should be recognized under our common law. We simply disposed of the claim on other grounds. *See Jessen*, 2018 WL 1004659, at \*7–8 (the underlying tort failed); *Immobiliere*, 525 S.W.3d at 882–83 (there was no evidence of causation).

The question becomes whether we should recognize the claim now.

When deciding to recognize a new cause of action, courts "must perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified." *See Kinsel v. Lindsey*, 526 S.W.3d 411, 423 n.6 (Tex. 2017). The non-dispositive factors we must consider include (1) the foreseeability, likelihood, and

31

magnitude of the risk of injury; (2) the existence and adequacy of other protections against the risk; (3) the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the persons in question; and (4) the consequences of imposing the new duty, including whether Texas's public policies are served or disserved, whether the new duty may upset legislative balancing-of-interests, and the extent to which the new duty provides clear standards of conduct so as to deter undesirable conduct without impeding desirable conduct or unduly restricting freedoms. *Id.*

A.Z. has briefed none of these factors. Instead, she mostly relies on *Stein* and other lower court cases citing it, which are not authoritative for the reasons stated above. A.Z. also relies on some lower court cases that do not cite to *Stein*, but these are not authoritative either because they all trace back to a tort law treatise that the Supreme Court considered and declined to adopt (and which *Stein* itself had cited). *See Juhl*, 936 S.W.2d at 643 (discussing Prosser & Keeton on Torts).

Because A.Z. has not briefed any of the factors identified in *Kinsel*, or explained why a claim for aiding and abetting should be recognized in addition to a claim for civil conspiracy, we conclude that this case does not warrant an extension of existing law. *See Rice*, 533 S.W.3d at 63.

## B.     There is no other basis for Turcios's liability.

In addition to her claim for aiding and abetting, A.Z. alleged that Turcios was liable because he was negligent in failing to report Solis's sexual assaults to a law enforcement agency, as required by section 261.109 of the Texas Family Code. In furtherance of this theory of liability, A.Z. requested the submission of three separate questions during the charge conference. The first question was a predicate question that asked whether Turcios knew or should have known about the sexual assaults. The second question asked whether A.Z.'s damages were proximately caused by

32

Turcios's negligence in failing to report the sexual assaults. And the third question asked whether A.Z.'s damages resulted from Turcios's gross negligence.

Turcios objected on the ground that the law did not impose a duty. The trial court agreed with Turcios that a failure to report would not give rise to a civil cause of action. The trial court refused to submit A.Z.'s negligence question, but it nevertheless submitted the predicate question and the gross negligence question, and the jury returned affirmative findings under both.

Turcios now argues that these findings cannot support his liability. A.Z. has not responded to this point of error. We agree with Turcios that his liability cannot be based on these findings. *See Perry v. S.N.*, 973 S.W.2d 301, 309 (Tex. 1998) ("It is not appropriate to adopt Family Code section 261.109(a) as establishing a duty and standard of conduct in tort.").

## CONCLUSION

We REVERSE the trial court's judgment and we (1) REMAND the common law claim of sexual assault against Solis for new trial; (2) REMAND the statutory claim of sexual harassment against Chipotle for new trial; (3) RENDER judgment that A.Z. take nothing on her common law claim of sexual assault against Chipotle; and (4) RENDER judgment that A.Z. take nothing against Turcios.


/s/    Tracy Christopher
       Justice


Panel consists of Justices Christopher, Jamison, and Brown.